**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

In re:

**HULL ORGANIZATION, LLC,**                    Case No. 23-32983-mbn
                                                               Chapter 7 (Jointly Administered)
                                                               Judge: Mary Elisabeth Naumann

          Debtor.

---

**US MARTIAL ARTS ACADEMY, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR RELIEF FROM ORDER**
**AUTHORIZING PRIVATE SALE OF COLLATERAL**

---

## I.  INTRODUCTION

This Court has scheduled an evidentiary hearing for March 24, 2026, to address US Martial Arts Academy, Inc.'s ("USMAA") Motion for Relief from Order Authorizing Private Sale of Collateral (Doc. 554).  The hearing addresses whether USMAA's commercial lease with Hull Organization, LLC ("Hull") survived the January 23, 2024 Sale Order (Doc. 56), and whether USMAA is entitled to relief from any purported extinguishment of that leasehold interest.  The evidence will establish four independent and mutually reinforcing grounds for relief, each sufficient standing alone.

USMAA operated its martial arts academy at 834 Ohio Pike, Unit 240, Cincinnati, Ohio 45245 (the "Premises") for over fifteen (15) years under a valid commercial lease.  USMAA received no notice of the bankruptcy sale proceedings, was never afforded an opportunity to appear or object, and thus had its constitutionally protected property rights adjudicated in absentia.  The evidence further demonstrates that Park Plaza Holdings, LLC ("Park Plaza"), by accepting approximately nineteen (19) months of rent under the lease, expressly acknowledging the lease assignment in

writing on the closing date, and later demanding lease-based reimbursements totaling $20,754.56, waived and ratified USMAA's lease as a matter of law. Park Plaza cannot simultaneously accept the benefits of the lease and deny its existence.

## II.  ISSUES IN QUESTION

The following issues are presented for the Court's determination:

1.  Whether the Sale Order (Doc. 56) is void as to USMAA's leasehold interest pursuant to Federal Rule of Civil Procedure 60(b)(4), made applicable by Federal Rule of Bankruptcy Procedure 9024, because USMAA received no constitutionally adequate notice before entry of the order purporting to extinguish its leasehold interest.

2.  Whether USMAA's lease survived the bankruptcy sale by the express terms of the Sale Agreement (Doc. 24, Ex. A, § 6), which provided that Park Plaza acquired the property "subject to the rights of tenants and leases currently in effect," and which was incorporated into and approved by the Sale Order.

3.  Whether Park Plaza waived and ratified USMAA's lease through its post-closing conduct, including its written acknowledgment on the closing date that "all leases have been assigned," its acceptance of approximately nineteen months of rent payments without objection, and its issuance of a lease-based invoice demanding $20,754.56.

4.  Whether Park Plaza can establish bona fide purchaser status, given its actual knowledge of USMAA's lease before closing, USMAA's fifteen years of open and notorious possession constituting constructive notice under Ohio law, and the Sale Agreement's express acknowledgment of existing tenant rights.

5.  Whether the lease's termination option—requiring 180-day written notice prior to March 1, 2025—was exercised by either party, and if not, whether the lease automatically continues through its stated term of February 28, 2030.

## III.  SUMMARY OF EVIDENCE

### A.  USMAA Received No Notice of the Bankruptcy Proceedings

The evidence will establish that USMAA received no notice at any stage of Hull's bankruptcy proceedings.  USMAA first learned that Hull had filed for bankruptcy in mid-January 2024, when Receiver Cullen Bilyeu communicated with USMAA's president, David Tester.  Significantly, nothing in that communication gave USMAA any reason to believe its lease rights were in jeopardy.  From USMAA's perspective, a buyer was being identified who would become its new landlord and would honor the existing tenants' leases—as the Sale Agreement required and as Ohio law independently demanded.  USMAA's lease rights were never presented to it as a subject of dispute.  USMAA received no written notice of the bankruptcy petition, the motion to sell the property (Doc. 24), the January 9, 2024 hearing, or the Sale Order.  USMAA was not identified on any service list and was never provided an opportunity to appear, object, or protect its leasehold interest.

The January 9, 2024 hearing transcript (Doc. 724) is particularly telling.  At that hearing, Attorney Paul T. Saba—then appearing as counsel for Stock Yards Bank—spoke on the record regarding "uncertainty with the tenants."  Debtor's counsel described the property as having "paying tenants" and a "stable tenant base."  Despite these on-record acknowledgments of tenant occupancy, no tenant—including USMAA—was provided notice or an opportunity to be heard. The notice recital in the Sale Order (Doc. 24-4, ¶ 3)—"Proper, timely, adequate, and sufficient notice of the Motion was provided"—was drafted by movants' counsel and inserted into the

tendered order, not the product of an independent judicial determination.  Notice was given only to the creditors and parties listed in the Motion, principally Stock Yards Bank and its counsel.  Tenant notice was not required because the Motion sought nothing adverse to tenants: it asked only for the Court's authorization for the parties to perform their obligations under the already-negotiated Sale Agreement.  The Sale Agreement itself, in § 6, had already resolved the question of tenant rights by expressly providing that the buyer would take the property "subject to the rights of tenants and leases currently in effect."  Tenants had no reason to appear and object because nothing in the Motion or the Sale Agreement threatened their leasehold interests.  Park Plaza's contention that the Sale Order extinguished USMAA's lease is a post-closing fabrication—one that inverts the plain terms of the transaction and, not coincidentally, would have the effect of freeing Park Plaza from the below-market rent USMAA held under its existing lease.

USMAA's compliance with the Receiver's requests further demonstrates its good faith and the Receiver's actual knowledge of the tenancy.  On December 9, 2023, Mr. Tester mailed the executed lease agreement and a rent check to Receiver Bilyeu in response to the Receiver's tenant verification request.  The evidence will include documentary proof of this submission and the subsequent sixteen (16) documented communications between Mr. Tester and Receiver Bilyeu from December 2023 through April 2024.

### B.  The Sale Agreement by Its Express Terms Preserved USMAA's Lease

The threshold question is not whether the Sale Order could theoretically have extinguished USMAA's lease, but whether it actually did—and the Motion's own text forecloses that reading entirely.  In the 'Relief Requested' section of the Motion, the Movants defined the entirety of what they asked this Court to do: the Movants 'respectfully seek entry of the Proposed Order authorizing the Private Sale of the Property, free and clear of any liens, claims, and encumbrances, and granting

related relief' (Doc. 24, ¶ 17).  Lease extinguishment does not appear in that statement.  It does not appear anywhere in the Motion.  The Motion opened by stating that 'the Debtor seeks authority to sell all of its rights, title, and interest in the Property to Park Plaza Holdings, LLC' (Doc. 24, ¶ 4)—the Debtor's own interest, not an adjudication of third-party tenant rights.  The 'related relief' actually sought is catalogued in Motion paragraphs 31 and 32: a good-faith purchaser finding under § 363(m) and a waiver of the Rule 6004(h) stay.  Tenants are mentioned in neither paragraph.  The Motion's Notice section confirms who was treated as a party in interest: 'the U.S. Trustee; . . . all parties known or reasonably believed to have asserted a lien or security interest against any of the Property; and . . . all parties who have requested service pursuant to Bankruptcy Rule 2002' (Doc. 24, ¶ 33).  Tenants are absent from that list because the Motion was not adverse to them—there was nothing for a tenant to object to.  The Sale Order confirms the same.  Paragraph 8 authorizes the Debtor 'to perform its obligations under the Sale Agreement, to comply with the terms of the Sale Agreement, and to consummate the sale . . . pursuant to and in accordance with the terms and conditions of the Sale Agreement' (Doc. 24-4, ¶ 8).  That is authorization to perform a contract that, by its own § 6, obligated Park Plaza to take the property 'subject to the rights of tenants and leases currently in effect.'  Most decisive is Sale Order paragraph 7: 'The failure specifically to include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, and the Court hereby authorizes the Debtor to enter into the Sale Agreement, which is approved in its entirety' (Doc. 24-4, ¶ 7).  USMAA's leasehold is not specifically addressed in the Sale Order.  By the Order's own terms, those rights therefore survive unimpaired.  This is not a close interpretive question—it is the plain meaning of every document the parties signed and this Court approved.

The significance of this reading extends beyond the bankruptcy proceeding and goes to the conduct of the parties who engineered the transaction. Attorney Paul T. Saba appeared at the January 9, 2024 hearing as counsel for Stock Yards Bank, spoke on the record about 'uncertainty with the tenants,' and signed the Sale Order as counsel for the secured lender. His firm, Stagnaro, Saba & Patterson Co., L.P.A., owns and operates Hyde Park Title Agency, which conducted the title examination for this very transaction. Mr. Saba thus occupied three simultaneous roles in a single deal: creditor's counsel at the sale hearing, signatory to the Sale Order, and principal of the title company that cleared the property for transfer. In none of those roles did Mr. Saba raise the possibility that the Sale Order would extinguish USMAA's lease—because the documents he participated in drafting and approving contained no such provision. The contention that the Sale Order extinguished USMAA's lease was manufactured after the closing, after Park Plaza had already acknowledged the lease in writing on February 7, 2024, collected nineteen consecutive months of rent under it, and issued a $20,754.56 invoice calculated by direct reference to the lease. That sequence—affirmatively acknowledging the lease, accepting its benefits for nearly two years, and then repudiating it once it became financially advantageous to do so—is not a permissible legal position; it is the bad faith dealing that gives rise to USMAA's parallel state court claims for wrongful eviction, fraudulent misrepresentation, tortious interference, and promissory estoppel. This Court's determination that the lease survived the Sale Order is the predicate upon which those claims rest, and the record before this Court leaves no basis for any other conclusion.

The Sale Agreement (Doc. 24, Ex. A), executed prior to the bankruptcy sale and approved by the Sale Order, contains an express provision preserving existing tenant rights. Section 6 of the Sale Agreement provides that Park Plaza acquired the property "subject to the rights of tenants and

leases currently in effect."  This language constitutes an express contractual "Permitted Exception" to the free-and-clear transfer.

The Sale Order approved the Sale Agreement together with "all of the exhibits, amendments, terms, and conditions thereof" (Doc. 24-4, ¶ 2).  A sale order must be construed in light of the underlying sale agreement it incorporates.  See *In re Haskell, L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005) (interpreting § 363 sale order in conjunction with its underlying sale agreement).  The Sale Order cannot be read to extinguish the very interests the Sale Agreement expressly preserved. Courts are required to interpret orders in a manner that avoids constitutional violations, see *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005); accordingly, any ambiguity in the Sale Order must be resolved in favor of preserving USMAA's leasehold rather than reading the Order to deprive USMAA of a constitutionally protected property right without notice or hearing.

The Sale Order's list of "Permitted Exceptions" (Doc. 56, Ex. C) expressly identifies only certain easements and the AT&T cell tower lease as recorded encumbrances.  The Order is entirely silent with respect to unexpired commercial tenant leases as a category.  This silence does not extinguish unrecorded tenant leases where (a) the Sale Agreement expressly preserved them, (b) the tenant had not been served and had no opportunity to appear, and (c) Ohio law does not require recording as a condition of a commercial lease's validity.

## C.  Park Plaza Waived and Ratified USMAA's Lease Through Post-Closing Conduct

The evidence of Park Plaza's post-closing conduct is among the most powerful in this case, because it comes directly from Park Plaza's own words and actions over nineteen consecutive months.  The evidence will establish the following undisputed course of dealing:

First, on the day of closing—February 7, 2024—Park Plaza's representative Matt Nobles delivered a written "Tenant Notice" to all tenants of the property expressly stating: "All leases

have been assigned." (Doc. 554, Ex. C, p. 1.)  On that same date, Mr. Nobles sent USMAA an email stating that he had reviewed the lease and confirming the monthly rent of $2,700.  (Doc. 554, Ex. C, p. 2.)  Park Plaza acknowledged the lease, identified its terms, and directed USMAA to continue paying rent—all on the day of closing.

Second, Park Plaza accepted rent from USMAA every month for approximately nineteen (19) consecutive months following closing, without objection, without placing payments in escrow, and without reserving any right to disclaim the lease.

Third, on September 2, 2025, Park Plaza sent USMAA a reimbursement invoice in the amount of $20,754.56 for property taxes and HVAC maintenance—obligations expressly arising under the lease.  Park Plaza cannot demand performance of lease obligations while simultaneously asserting that no lease exists.

Fourth, on June 20, 2025, Mr. Nobles texted Mr. Tester requesting a copy of the lease.  A party who genuinely believes the lease was extinguished at closing does not request a copy of it seventeen months later.

Fifth—and critically—after purporting to terminate the lease via the June 30, 2025 Notice of Termination (effective July 30, 2025), Park Plaza accepted rent from USMAA for July and August 2025.  U.S. Bank check images confirm: Check No. 3196 ($2,800.00, dated 07/01/2025, Memo: "Rent – July 25") was cashed on July 15, 2025; Check No. 3197 ($1,600.00, dated 07/01/2025, Memo: "Rent Correction") was likewise cashed on July 15, 2025; and Check No. 3230 ($2,800.00, dated 08/29/2025) was cashed on August 29, 2025 (USMAA-16).  In total, Park Plaza accepted $7,200.00 in rent payments after the purported

July 30, 2025 termination effective date—without objection, without return, and without instituting any statutory eviction process.  On September 2, 2025, Park Plaza then issued a $20,754.56 lease-based reimbursement invoice with CAM charges calculated through August 31, 2025 (USMAA-14), simultaneously claiming the lease was terminated and demanding money owed under it.  USMAA tendered September 2025 rent as well; that check was never cashed—Park Plaza instead changed the locks on September 5, 2025.

This course of conduct, viewed in totality, constitutes unequivocal waiver and ratification of USMAA's lease under Ohio law.  The post-termination rent acceptance is independently dispositive under *Springboro Commons Ret. Villa, Inc. v. Feltner,* 2021-Ohio-544 (12th Dist.): a landlord who accepts rent after issuing a termination notice is estopped from enforcing the termination, because the acceptance is inherently inconsistent with the expressed intent to terminate and constitutes affirmative recognition of the tenant as an ongoing tenant.  The June 30, 2025 Notice of Termination is void on its face under Springboro—extinguished by Park Plaza's own cashing of Check No. 3196 ($2,800.00) and Check No. 3197 ($1,600.00) on July 15, 2025, and Check No. 3230 ($2,800.00) on August 29, 2025, for a combined $7,200.00 accepted after the stated termination effective date of July 30, 2025 (USMAA-16).  USMAA tendered September rent as well; Park Plaza never cashed it—choosing instead to change the locks on September 5, 2025.  That self-help eviction cannot stand either as enforcement of a void termination notice or as an independent landlord remedy, because no lawful termination had ever been effected.

### D.  Park Plaza Cannot Establish Bona Fide Purchaser Status

The evidence will demonstrate that Park Plaza had both actual and constructive knowledge of USMAA's leasehold interest before closing, which independently and collectively defeat any claim to bona fide purchaser status under Ohio law.  A purchaser with actual knowledge of an existing

tenant's occupancy and lease rights cannot invoke the bona fide purchaser doctrine to extinguish those rights. *Shaker Corlett Land Co. v. City of Cleveland*, 139 Ohio St. 536, 41 N.E.2d 243 (1942). The record here goes far beyond what is necessary to defeat bona fide purchaser status—it establishes a documented, chronological chain of actual personal knowledge by Park Plaza's representative, R. Matt Nobles, that began during the escrow period and continued unbroken through and beyond the date of closing.

The actual-knowledge timeline is established by the documents themselves. During the escrow period—approximately one to two weeks before the January 23, 2024 Sale Order was entered—Nobles arranged for dumpster service at the property. In a text message to Receiver Bilyeu on January 23, 2024, Mr. Tester confirmed: 'We did get a dumpster last week' (USMAA-10). A purchaser's representative who arranges property management services for operating tenants during the escrow period necessarily knows those tenants exist and are in active possession. Then, on January 24, 2024—the day after the Sale Order was entered and two weeks before closing—Nobles physically visited USMAA's occupied premises. He left his business card inside the martial arts academy. Mr. Tester photographed that card and forwarded it to Receiver Bilyeu the same day (USMAA-10; Bilyeu text, Jan. 24, 2024, 12:21 PM). This is direct, contemporaneous photographic evidence that Park Plaza's agent walked into USMAA's operating business—with full view of USMAA's signage, equipment, and active commercial use—and left his contact information, all while the escrow was still open and no deed had yet transferred. No purchaser who has personally visited an active tenant's commercial space, arranged garbage service for that tenant, and left a business card in that space can thereafter claim to have been unaware of the tenant's existence or leasehold possession.

The pre-closing actual knowledge was confirmed in writing on the morning of closing itself. At 11:09 AM on February 7, 2024—hours before the 3:30 PM closing—Nobles emailed Tester: 'Good morning – the closing on the property is scheduled for 3:30PM today.  Attached is the tenant notice.  We've been reviewing your lease and your monthly rent is $2,700.  Please send February rent to the address listed on the notice' (USMAA-7; Doc. 554, Ex. C, p. 2).  Park Plaza not only knew USMAA occupied the space—it had reviewed the lease in sufficient detail to confirm the specific contractual rent figure before the closing documents were signed.  The simultaneously delivered Tenant Notice stated that 'all leases have been assigned' to Park Plaza (USMAA-6; Doc. 554, Ex. C, p. 1)—Park Plaza's own affirmative representation that existing leases survived and were transferred to the new owner.  The actual-knowledge chain does not end at closing.  On June 20, 2025—after sixteen months of rent collection—Nobles texted Tester: 'I just notified legal of our conversation.  If you can email me a copy of your lease with Hull – I can submit it' (USMAA-11).  A party that requests a copy of its tenant's lease in June 2025 cannot credibly argue that it had no knowledge of that lease's existence in January or February 2024.

As to constructive knowledge, even if the foregoing actual knowledge were somehow set aside, USMAA's fifteen (15) years of open and notorious possession of the Premises—operating a martial arts academy with prominent signage affixed to the building, visible from Ohio Pike, with consistent student traffic and exclusive use of a dedicated commercial space—constituted constructive notice of USMAA's leasehold under Ohio law, independently sufficient to defeat bona fide purchaser status.  Ohio courts have consistently held that a purchaser of land in the actual possession of a third party is chargeable with constructive notice of the occupant's title and equities, regardless of whether the purchaser conducted a physical site visit.  *Peck v. A & N Serv. Co.*, 2006-Ohio-1358; *Dart v. Katz*, 2021-Ohio-1429; *H&S Co. v. City of Aurora*, 2004-Ohio-

3507.  Park Plaza, as a sophisticated commercial real estate investor acquiring an operating strip mall, carried a heightened duty of inquiry as to each visibly occupied tenant space.  This constructive notice ground is independent and fully sufficient on its own—but in this case it is entirely redundant, because the actual notice established by the Nobles business card visit, the dumpster arrangement, the pre-closing lease review email, and the post-closing rent collection leaves no colorable claim that Park Plaza was unaware of USMAA's leasehold tenancy at any point in this transaction.

### E.  The Lease Termination Option Expired Unexercised; the Lease Runs Through 2030

Park Plaza has argued that even if USMAA's lease survived the Sale Order, the lease was subject to a termination option exercisable by either party upon 180 days' advance written notice prior to March 1, 2025, and that this option limits any protected term to that date.  This argument fails for multiple independent reasons.

The lease provides that either party could cancel years 6 through 10 of the lease term effective March 1, 2025, by providing not less than 180 days' advance written notice.  The 180-day notice deadline fell on or about September 1, 2024.  Neither USMAA nor Park Plaza provided any written termination notice before that deadline.  The termination option accordingly expired unexercised. Under settled Ohio law and general contract principles, a termination option that is not exercised in strict compliance with its terms—including its notice requirements and deadline—lapses and cannot thereafter be exercised.

Furthermore, Park Plaza's own post-closing conduct—accepting rent through the summer of 2025, requesting a lease copy in June 2025, and sending a lease-based invoice in September 2025 —is wholly inconsistent with any good-faith belief that the lease had been terminated.  The lease accordingly remains in full force and effect through its stated term of February 28, 2030.

## IV.  LEGAL AUTHORITIES

### A.  Ohio Law Provides the Substantive Framework for USMAA's Leasehold Rights

A proper analysis of USMAA's leasehold interest begins with identifying the substantive law that governs it.  Two independent sources converge on the same answer: Ohio law applies.  First, the property at issue—830 and 834 Ohio Pike, Cincinnati, Clermont County—is situated in Ohio. Under the well-established conflict-of-laws principle of lex loci rei sitae, the law of the state where real property is located governs questions of title, possession, and the rights of parties asserting interests in that property.  The Sale Agreement (Doc. 24-1) contains no choice-of-law provision departing from this default rule.  Second, the USMAA lease itself contains an express governing law clause providing that the agreement 'shall be governed, construed and interpreted by, through and under the Laws of the state in which this agreement resides.'  The premises are in Ohio; Ohio law governs.  Park Plaza, as the party who took title under a purchase agreement expressly acknowledging existing tenant leases, accepted the lease relationship—and its governing law—as part of the transaction.  Ohio law accordingly provides the substantive framework for evaluating: (1) the validity and enforceability of USMAA's leasehold against a subsequent purchaser; (2) the constructive and actual notice rules that bear on bona fide purchaser status; and (3) the waiver and estoppel principles arising from Park Plaza's post-closing conduct.

Federal bankruptcy law reinforces rather than displaces this analysis.  In *Butner v. United States*, 440 U.S. 48, 55 (1979), the Supreme Court recognized that property interests in bankruptcy proceedings are ordinarily 'created and defined by state law,' and that applying uniform federal rules to disturb those state-created interests would 'disrupt commercial expectations and undermine the equitable treatment of similarly situated creditors.'  The Butner principle reflects a considered policy choice: bankruptcy courts are not instruments for restructuring substantive property rights

that state law has already settled.  Applied here, it means that the nature and extent of USMAA's leasehold—and the legal consequences of Park Plaza's conduct toward that leasehold—are questions that Ohio property law is best suited to answer, with the federal bankruptcy provisions of § 363, Rule 60(b)(4), and § 365(h) serving as the procedural vehicle through which this Court gives effect to those rights.  The analysis that follows in Sections IV.B through IV.F draws on both bodies of law in that complementary relationship.

## B.  Due Process Requires Notice Reasonably Calculated to Apprise Interested Parties

The Fifth Amendment guarantees that no person shall be deprived of property without due process of law.  In *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), the Supreme Court held that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  This requirement applies with full force in bankruptcy proceedings.  *City of New York v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 293, 297 (1953) (due process requires notice to known creditors whose claims would be extinguished by a bankruptcy reorganization).

A bankruptcy sale order that purports to extinguish the leasehold interest of a tenant who received no notice of the sale proceedings cannot bind that tenant.  USMAA was a known commercial tenant of fifteen years' standing, occupying the Premises with open and notorious signage, paying rent to a court-appointed Receiver.  Its identity and location were readily ascertainable.  The failure to provide notice was not excusable under any standard.

## C.  Relief from a Void Judgment Under Rule 60(b)(4) Is Not Discretionary and Is Not Time-Barred

Federal Rule of Civil Procedure 60(b)(4), applicable to bankruptcy proceedings via Federal Rule of Bankruptcy Procedure 9024, provides that a court shall relieve a party from a final order if

"the judgment is void."  A judgment is void under Rule 60(b)(4) where the court violated due process by depriving a party of notice or the opportunity to be heard.  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010).  Critically, relief under Rule 60(b)(4) is not discretionary—if a judgment is void, the court must vacate it.  Id.

Unlike all other Rule 60(b) subsections, a motion under Rule 60(b)(4) for a void judgment is not subject to any outer time limitation.  Federal Rule of Civil Procedure 60(c)(1) provides that motions under Rule 60(b) must be made "within a reasonable time," and specifically exempts motions under subsections (b)(1), (2), and (3) from exceeding one year—but imposes no such limit on (b)(4).  Because a void judgment is a legal nullity, the passage of time does not impart validity to it.  USMAA's motion was filed promptly upon retaining counsel and discovering the procedural history of the sale.

### D.  The Sixth Circuit's District Precedent and the MMH Automotive Framework Govern This Court's Analysis

In *South Motor Co. v. Carter-Pritchett-Hodges, Inc. (In re MMH Automotive Group, LLC)*, 385 B.R. 347 (Bankr. S.D. Fla. 2008), the bankruptcy court addressed a nearly identical scenario in which a tenant's leasehold interest was affected by a § 363 sale order entered without adequate notice to the tenant.  The MMH court held that the appropriate remedy was to fashion equitable relief placing the tenant in the position it would have occupied had it received notice and been given the opportunity to object.  This Court previously directed the parties to review the *MMH Automotive* decision—underscoring its particular relevance here.

The MMH framework is further supported by *In re Samaritan Alliance, LLC*, 2007 WL 4162918 (Bankr. E.D. Ky. Nov. 21, 2007), decided by a bankruptcy court within this circuit.  There, the court adopted the majority position established in *In re Haskell, L.P.*, 321 B.R. 1 (Bankr. D. Mass. 2005), holding that a debtor's sublessee was entitled to the protections of 11 U.S.C. §

- 15 -

365(h) after a free-and-clear § 363 sale.  Consistent with the majority of courts that have addressed this issue, *In re Samaritan Alliance* confirms that a debtor-landlord cannot use § 363(f)'s general free-and-clear provisions to accomplish indirectly what § 365(h) prohibits directly—dispossessing a tenant of its leasehold without consent and without the procedural protections Congress mandated.  See also *In re Churchill Props. III, L.P.*, 197 B.R. 283, 288 (Bankr. N.D. Ill. 1996) ("since Congress decided that lessees have the option to remain in possession, it would make little sense to permit a general provision, such as section 363(f), to override its purpose").

---

1 Park Plaza has relied upon *In re Spanish Peaks Holdings II, LLC*, 862 F.3d 1148 (9th Cir. 2017), and *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir. 2003), for the proposition that § 363(f) can override § 365(h) tenant protections in a free-and-clear sale.  That reliance is misplaced for at least four independent reasons.  First, both *Spanish Peaks* and *Qualitech* are out-of-circuit decisions that have not been adopted by the Sixth Circuit; this Court is instead guided by the in-circuit precedent of *In re Samaritan Alliance, LLC*, 2007 WL 4162918 (Bankr. E.D. Ky. 2007), which applies the majority *Haskell* rule.  Second, *Spanish Peaks* involved tenants whose unrecorded leases were subordinate to a senior mortgage lien—the Ninth Circuit's rationale was that the result mirrored what would have occurred in a state-law mortgage foreclosure.  This case involves a negotiated bankruptcy sale, not a foreclosure; Hull's secured lender did not foreclose, and there is no senior lien that would have wiped out USMAA's leasehold under Ohio law.  Third, and critically, the Sale Agreement in this case expressly preserved existing tenant rights in § 6—a contractual carve-out wholly absent from *Spanish Peaks*.  Park Plaza cannot claim the benefit of *Spanish Peaks*' free-and-clear logic when its own purchase contract acknowledged and preserved the very tenant rights it now seeks to extinguish.  Fourth, in both *Spanish Peaks* and *Qualitech* the tenants received notice of the sale and had the opportunity to assert § 365(h) protections.  USMAA received no notice and was denied that opportunity entirely—a constitutional infirmity that independently voids the Sale Order as to USMAA's leasehold under Rule 60(b)(4) regardless of how the § 363(f)/§ 365(h) conflict is resolved.

## E.  Park Plaza's Waiver and Ratification of the Lease Are Established Under Ohio Law

Under Ohio law, waiver of a contractual right occurs when a party acts in a manner inconsistent with the intention to insist on that right.  *Hounshell v. Am. States Ins. Co.*, 67 Ohio St. 2d 427, 430, 424 N.E.2d 311 (1981).  Ohio courts have consistently applied this principle to lease disputes, holding that a landlord's acceptance of rent without objection constitutes a clear and unequivocal waiver of the right to take inconsistent positions regarding the tenancy.  In *EAC Properties, LLC v. Brightwell*, 2011-Ohio-2373, the court held that a landlord's acceptance of reduced rent for thirteen consecutive months without objection effected a waiver of the original lease terms.  The waiver in this case is far stronger: Park Plaza accepted full contractual rent for nineteen consecutive months,

expressly acknowledged the lease assignment in writing on day one, and demanded lease-based reimbursements.

Ohio courts have further held that acceptance of rent after a purported termination estops the landlord from enforcing the termination, because such acceptance is inherently inconsistent with an intent to terminate and constitutes affirmative recognition of the tenant as an ongoing tenant. In *Springboro Commons Ret. Villa, Inc. v. Feltner*, 2021-Ohio-544 (12th Dist.), the court held that a landlord's acceptance of rent for September and October 2019, after issuing a termination notice effective August 31, 2019, invalidated the termination notice and defeated the landlord's subsequent forcible entry action. The landlord could not, the court held, act in a manner inconsistent with its expressed intent to terminate and then seek to enforce that termination. That holding applies with full force here—and the facts here are even stronger.

Park Plaza issued its Notice of Termination on June 30, 2025, purporting to terminate USMAA's tenancy effective July 30, 2025. Bank check images from USMAA's U.S. Bank account confirm that Park Plaza then cashed three rent instruments after that effective date: Check No. 3196 ($2,800.00, dated 07/01/2025, Memo: "Rent – July 25"), processed July 15, 2025; Check No. 3197 ($1,600.00, dated 07/01/2025, Memo: "Rent Correction"), also processed July 15, 2025; and Check No. 3230 ($2,800.00, dated 08/29/2025), processed August 29, 2025—a total of $7,200.00 accepted after the purported July 30, 2025 termination effective date (USMAA-16). On September 2, 2025, Park Plaza issued a $20,754.56 lease-based reimbursement invoice with CAM charges calculated through August 31, 2025 (USMAA-14). USMAA tendered September 2025 rent; that check was never cashed—Park Plaza changed the locks on September 5, 2025 instead. Under Springboro, the June 30, 2025 Notice of Termination was extinguished by Park Plaza's cashing of July and August rent after the stated termination effective date. No valid termination of USMAA's

tenancy was ever accomplished. The September 5, 2025 lock change was therefore not enforcement of a valid termination—it was a unilateral self-help eviction of a tenant whose lease remained in full legal effect, conducted without resort to Ohio's forcible entry and detainer procedures. Ohio Rev. Code § 1923 et seq. does not permit it.

**F. Strict Compliance Is Required to Exercise a Lease Termination Option**

Lease options must be exercised in strict compliance with their terms, including any notice requirements and deadlines. *Andrews v. Blake*, 205 Ariz. 236, 239-40, 69 P.3d 7 (2003) (option not exercised in strict compliance with notice method lapses); *Thomson Learning, Inc. v. Olympia Props., LLC*, 365 Ill. App. 3d 621 (Ill. App. Ct. 2006) (failure to comply with option notice deadline results in lapse). The 180-day notice deadline in USMAA's lease expired on approximately September 1, 2024, without any written notice of termination from either party. The option therefore lapsed. Neither the bankruptcy sale itself nor Park Plaza's post-deadline conduct constitutes a valid exercise of the termination option. 11 U.S.C. § 365(h)(1)(A)(ii) protects tenant rights "for the balance of the term of such lease"—the actual remaining unexpired term, not a hypothetically shortened term that could have resulted from an option that was never exercised.

**V. CONCLUSION**

The evidence at the March 24, 2026 hearing will establish that USMAA's commercial lease survived the January 23, 2024 Sale Order on four independent grounds: (1) the Sale Order is void as to USMAA's leasehold under Rule 60(b)(4) because USMAA received no constitutionally adequate notice; (2) the Sale Agreement by its own express terms preserved existing tenant leases as a "Permitted Exception"; (3) Park Plaza waived and ratified the lease through nearly two years of rent acceptance, written acknowledgment, and lease-based demands; and (4) Park Plaza cannot

claim bona fide purchaser status given its actual and constructive knowledge of USMAA's occupancy. The lease's termination option expired unexercised on September 1, 2024, and the lease accordingly remains in full force and effect through February 28, 2030.

Based on the foregoing, USMAA respectfully requests that this Court enter an order granting the following relief:

1. Declare that the Sale Order entered on January 23, 2024 (Doc. 56) is void as to USMAA's leasehold interest for want of constitutionally adequate notice, and that it has no preclusive or binding effect on USMAA's leasehold rights;

2. Declare that USMAA's Lease dated March 1, 2020 survived the bankruptcy sale and remains in full force and effect through its stated term of February 28, 2030, with all rights, obligations, and protections under 11 U.S.C. § 365(h)(1)(A)(ii) preserved;

3. Find, as a legal consequence of the declarations sought in Items 1 and 2 above, that Park Plaza's September 5, 2025 lock change and physical exclusion of USMAA from the Premises—undertaken while this matter was pending before this Court and while USMAA's leasehold rights remained in full force—constituted a deprivation of USMAA's rights under 11 U.S.C. § 365(h)(1)(A)(ii) and was without legal justification under Ohio law; this finding is sought as derivative of, and contingent upon, the Court's determination that the lease survived the Sale Order, and is not an independent claim for damages;

4. Issue findings of fact and conclusions of law with respect to: (a) the survival of USMAA's lease through the bankruptcy sale; (b) Park Plaza's actual and constructive knowledge of the lease prior to and at the time of closing; (c) Park Plaza's waiver and ratification of the lease through its post-closing conduct; and (d) the legal character of the September 5, 2025 exclusion in light of the lease's continued existence—such findings to

have preclusive effect in any subsequent proceeding, including Clermont County, Ohio Case No. 2026CVC303, in which USMAA pursues its state law claims for wrongful eviction, fraudulent misrepresentation, tortious interference, conversion, unjust enrichment, and promissory estoppel;

5.   Award USMAA its reasonable attorneys' fees, costs, and expenses on the following independent grounds: (a) pursuant to 11 U.S.C. § 105(a), based on Park Plaza's prolonged pursuit of a legally unsupportable lease-extinguishment theory before this Court—a position contradicted by the plain text of every transaction document Park Plaza signed—and Park Plaza's commission of a self-help eviction while this matter was sub judice, each constituting bad faith conduct in a proceeding before this Court warranting the exercise of this Court's equitable sanctions authority; and (b) as an intended third-party beneficiary of Sale Agreement § 17, which provides that 'the prevailing party in any legal action shall have the right to be reimbursed for all costs, fees, and expenses, including...reasonable legal fees for enforcement or defense of its rights under this Contract' (Doc. 24-1, § 17)— USMAA, as the tenant whose rights were expressly preserved by Sale Agreement § 6, is an intended beneficiary of that contract provision and is entitled to enforce the prevailing-party fee clause upon the Court's declaration that its lease survived the sale; and

6.   Grant such other and further relief as this Court deems just and equitable.

        Respectfully submitted,
        /s/ Kemal V. Catalan
        Kemal V. Catalan, Esq., Ph.D.
        KY Bar No. 100662
        KVC Law Firm, LLC
        539 Liberty Hill
        Cincinnati, Ohio 45202
        Counsel for US Martial Arts Academy, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, a true and correct copy of the foregoing Memorandum of Law was served upon all parties of record via the Court's CM/ECF electronic filing system, including counsel for Park Plaza Holdings, LLC, Paul T. Saba, SSP Law Co., L.P.A.

/s/ Kemal V. Catalan
Kemal V. Catalan, Esq., Ph.D.