FILED
2026 MAR -2 PM 12:47
*[stamp, partially illegible]* COURT OF COMMON PLEAS CLERMONT COUNTY, OH

**IN THE COURT OF COMMON PLEAS**
**CLERMONT COUNTY, OHIO**

**US MARTIAL ARTS ACADEMY, INC.,**

*Plaintiff,*

v.

**PARK PLAZA HOLDINGS, LLC,**

*Defendant.*

Case No. _____

Judge: _____

2026CVC303   JUDGE MILES

---

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT,**

**AND INJUNCTIVE RELIEF**

**(Jury Demand Endorsed Hereon)**

---

Plaintiff US Martial Arts Academy, Inc. ("USMAA"), by and through undersigned counsel, brings this action against Defendant Park Plaza Holdings, LLC ("Park Plaza") for declaratory judgment, breach of lease agreement, wrongful self-help eviction, breach of covenant of quiet enjoyment, tortious interference with business relationships, unjust enrichment, fraudulent misrepresentation, promissory estoppel, and violation of the implied covenant of good faith and fair dealing, and in support thereof states as follows:

**PARTIES**

**1.** Plaintiff USMAA is a corporation organized under the laws of Ohio with its principal place of business formerly located at 834 Ohio Pike, Suite 240, Cincinnati, Ohio 45245, Clermont

**EXHIBIT**
**1**

County, Ohio. USMAA operated a martial arts academy at the Premises for approximately fifteen (15) years before being wrongfully evicted by Defendant.

**2.** Defendant Park Plaza Holdings, LLC is an Ohio limited liability company organized on December 7, 2023 and engaged in the business of owning, managing, and operating commercial real estate properties. Upon information and belief, Park Plaza's members include Mark D. Ayer and R. Matt Nobles. Park Plaza's statutory agent is Michael S. Barron, 3074 Madison Road, Cincinnati, Ohio 45209.

**3.** At all times relevant hereto, Park Plaza has acted through its agents, employees, and representatives in conducting business in Clermont County, Ohio.

### JURISDICTION AND VENUE

**4.** This Court has subject matter jurisdiction over this action pursuant to Ohio Revised Code Section 2305.01 et seq. and Article IV, Section 4(B) of the Ohio Constitution. The amount in controversy exceeds $15,000.00 exclusive of interest and costs.

**5.** Venue is proper in Clermont County pursuant to Ohio Revised Code Section 2307.38 because the subject real property is located in Clermont County, Ohio, and the acts giving rise to this action occurred in Clermont County.

**6. Related Federal Proceeding.** USMAA has filed a Motion for Relief from the Order Authorizing the Private Sale of Collateral Free and Clear of Liens, Claims, and Encumbrances (Bankruptcy Proceeding Dkt. 554) and a Motion for Summary Judgment (Bankruptcy Proceeding Dkt. 791, filed February 23, 2026) in *In re Hull Organization, LLC*, Case No. 23-32983-mbn (Bankr. W.D. Ky.) (the "Bankruptcy Proceeding"). A status hearing on the Motion for Summary Judgment is set for March 10, 2026, and an evidentiary hearing is scheduled for March 24, 2026

(Bankruptcy Proceeding Dkt. 784). Those federal motions seek a narrow declaratory ruling that the bankruptcy court's Sale Order is void as to USMAA's leasehold interest due to constitutional due process violations. USMAA files this action to assert its state law claims for damages arising from Park Plaza's wrongful conduct, which claims are properly within this Court's jurisdiction and are not before the bankruptcy court.

## FACTUAL BACKGROUND

### A. USMAA's Long-Standing Tenancy

**7.** USMAA is a martial arts academy that has been in continuous operation for approximately thirty (30) years. For approximately fifteen (15) of those years, USMAA operated its academy at 834 Ohio Pike, Suite 240, Cincinnati, Ohio 45245 (the "Premises"), located within a commercial shopping center commonly known as the Park Plaza Shopping Center in Clermont County, Ohio.

**8.** On March 1, 2020, USMAA entered into a written Retail Commercial Lease Agreement (the "Lease") with Hull Organization, LLC ("Hull") for the Premises. The Lease provides for an Initial Term beginning March 1, 2020 and ending April 30, 2030, with the option for either party to cancel years 6–10 with 180-day notice prior to March 1, 2025. The current monthly rent under the Lease is $2,800.00. A true and correct copy of the Lease is attached hereto as **Exhibit A**.

**9.** USMAA's occupancy of the Premises was open and notorious at all times, with USMAA's business signage displayed on the exterior of the building and near the road frontage. USMAA's students, instructors, and visitors regularly used the Premises on a daily basis.

### B. The Receivership and Sale of the Property

**10.** Hull's sole member, Robert E. Hull, was party to contentious divorce proceedings in Jefferson Circuit Court, Family Division, Jefferson County, Kentucky (Case No. 20-CI-500489) (the "Family Court Action"). During those proceedings, the Family Court found that Mr. Hull had repeatedly mismanaged marital assets, including the commercial properties held by Hull.

**11.** On October 19, 2023, the Jefferson Circuit Court, Hon. Derwin Webb presiding, entered an Order appointing Cullen B. Bilyeu of Bilyeu Enterprises, LLC (the "Receiver") as receiver of all business entities under Mr. Hull's control, including Hull Organization, LLC. The Court's Order authorized the Receiver to take control of the entities, oversee management and distribution of profits, and retain accountants, attorneys, and other professionals as needed. The Court amended its Order on November 22, 2023 to include more detailed directives for the Receiver.

**12.** In or about late October or November 2023, the Receiver sent a letter to USMAA and the other tenants at the Park Plaza Shopping Center introducing himself and explaining the receivership. The Receiver's letter stated that he had been "appointed receiver of the property" and placed "by judicial order in control of the Hull Organization LLC in order to manage the entity in a way that preserves the assets it owns for the benefit of the owners, tenants, creditors, and other stakeholders." The Receiver further stated that he would "serve as the property manager and be in charge of leasing and operations" for the property. The Receiver's letter requested that tenants complete a tenant verification form and, if possible, provide a copy of their most current lease. A true and correct copy of the Receiver's letter is attached hereto as **Exhibit B**.

**13.** USMAA complied with the Receiver's request. On December 9, 2023, USMAA's president, David Tester, emailed the Receiver and submitted both the completed Tenant Verification Form and a copy of USMAA's Lease when paying USMAA's December 2023 rent. This submission occurred well before the bankruptcy sale closing in February 2024.

**14.** During the receivership period, USMAA's president David Tester and the Receiver were in regular and ongoing communication regarding maintenance issues at the property. USMAA regularly and timely paid its rent to the Receiver as directed without interruption.

**15.** On November 2, 2023, Stock Yards Bank & Trust Company ("Stock Yards Bank"), the secured creditor with a lien on the Property, issued a final notice of default and intent to foreclose on the Property.

**16.** On November 3, 2023, Hull filed a petition for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Western District of Kentucky, *In re Hull Organization, LLC*, Case No. 23-32983-mbn (Bankr. W.D. Ky.). USMAA was not listed on the creditor matrix or mailing list. Neither the Debtor, the Receiver, nor any other party served USMAA with notice of Hull's bankruptcy filing.

**17.** Despite the direct knowledge of USMAA's tenancy held by multiple parties—including the Receiver (through his own letter, USMAA's submission of its Tenant Verification Form and Lease, ongoing maintenance communications, and regular receipt of rent payments), Hull as the Debtor (which was the original landlord under the Lease and had an obligation to disclose its creditors and interested parties in the bankruptcy schedules), and Stock Yards Bank (which was a co-movant on the Joint Motion to Sell and whose counsel was present at the January 9, 2024 hearing where debtor's counsel testified to the existence of paying tenants)—none of these parties served USMAA with notice of the bankruptcy filing, the motion to sell the property free and clear of encumbrances, or the hearing on that motion.

**18.** On November 28, 2023, the Receiver executed a listing agreement with Tranzon Asset Advisors to market the Property for sale.

## C. The Bankruptcy Sale and Failure of Notice

**19.** On January 8, 2024, Hull and Stock Yards Bank filed a Joint Motion to Authorize the Private Sale of Collateral Free and Clear of Liens, Claims, and Encumbrances (Dkt. 24, *In re Hull Organization, LLC,* Case No. 23-32983-mbn (Bankr. W.D. Ky.)). USMAA did not receive notice of this motion or the subsequent hearing held on January 9, 2024.

**20.** At the January 9, 2024 hearing, debtor's counsel, Mr. Yeager, described the property as having "paying tenants, stable tenant base, and is at least, I think, 70 percent or 80 percent occupied." A true and correct excerpt of the transcript of the January 9, 2024 hearing is attached hereto as **Exhibit J.** (See Transcript of Hearing, *In re Hull Organization, LLC,* Case No. 23-32983-mbn (Bankr. W.D. Ky.), Dkt. 724, at 8:16–18.) This testimony confirmed that the existence of tenants and their lease relationships were known to all parties involved in the sale, including counsel for Stock Yards Bank, Paul T. Saba, Esq., who was present and spoke at the same hearing. *Id.* at 11:6–20.

**21.** The Sale Agreement attached to the Joint Motion provides at Section 6 that the property was sold "subject to the rights of tenants and leases currently in effect" and that the Receiver would "provide any and all information, leases and tenant information to the Buyer during the escrow period." A true and correct copy of the Sale Agreement is attached hereto as **Exhibit C.**

**22.** On January 23, 2024, the Bankruptcy Court entered an Order Approving the Private Sale of Collateral Free and Clear of Liens, Claims, and Encumbrances (the "Sale Order") (Dkt. 56, *In re Hull Organization, LLC,* Case No. 23-32983-mbn (Bankr. W.D. Ky.)). The Sale Order does not address unexpired tenant leases as a category. USMAA did not receive notice of the entry of the Sale Order. A true and correct copy of the Sale Order is attached hereto as **Exhibit I.**

**23.** No motion was ever filed under 11 U.S.C. § 365 to assume or reject USMAA's Lease in the Bankruptcy Proceeding.

## D. Park Plaza's Post-Closing Acknowledgment and Ratification

**24.** On February 7, 2024—the day the sale closed—Park Plaza sent USMAA an email stating: "We've been reviewing your lease and your monthly rent is $2,700." Attached to the email was a "Tenant Notice" stating: "All leases have been assigned." The Tenant Notice directed that all rent payments be made payable to Park Plaza Holdings, LLC. A true and correct copy of the email and attached Tenant Notice are attached hereto as **Exhibit D**.

**25.** Based on these communications, USMAA understood that its Lease had been assigned to Park Plaza and that Park Plaza recognized and accepted the Lease. USMAA began making monthly rent payments to Park Plaza as directed.

**26.** Park Plaza accepted monthly rent payments from USMAA for approximately nineteen (19) consecutive months, from February 2024 through approximately September 2025, without objection or reservation.

**27.** The Lease contained a termination option allowing either party to cancel years 6–10 with 180-day notice prior to March 1, 2025. The deadline for exercising this option was September 2, 2024. Neither party exercised this option. The Lease therefore continued in full force and effect through its stated term of April 30, 2030.

## E. Park Plaza's Lease-Based Demands

**28.** On or about September 2, 2025, Park Plaza's property manager, Matt Nobles of Valbridge Property Advisors, sent USMAA a reimbursement invoice for $20,754.56, citing expense and reimbursement provisions in USMAA's Lease. Mr. Nobles' email stated: "If we had the lease at time of closing or were given the lease prior to summer 2025, there are expense/reimbursement provisions in the lease that the tenant is responsible for in addition to base

rent." This invoice was calculated based on the terms of USMAA's Lease and included property tax and HVAC reimbursements. A true and correct copy of the reimbursement invoice and correspondence is attached hereto as **Exhibit E**.

**29.** Park Plaza's demand for lease-based reimbursements is fundamentally inconsistent with its simultaneous claim that USMAA's Lease was extinguished. Park Plaza cannot demand performance of lease obligations while simultaneously denying the lease's existence.

### F. The Wrongful Termination and Self-Help Eviction

**30.** On June 30, 2025, Park Plaza served USMAA with a "Notice of Termination," purporting to terminate USMAA's lease rights effective July 30, 2025 and claiming that USMAA's Lease had been extinguished by the Sale Order entered in the Bankruptcy Proceeding. This was the first notice USMAA received that any party claimed its Lease had been extinguished. A true and correct copy of the Notice of Termination is attached hereto as **Exhibit F**.

**31.** On July 17, 2025, USMAA filed its Motion for Relief from the Sale Order (Bankruptcy Proceeding Dkt. 554) and its Motion for Stay (Bankruptcy Proceeding Dkt. 555) in *In re Hull Organization, LLC*, Case No. 23-32983-mbn (Bankr. W.D. Ky.), seeking protection of its leasehold rights while the matter was adjudicated.

**32.** On or about September 5, 2025, while USMAA's motions were pending before the Bankruptcy Court, Park Plaza changed the locks on the Premises without court order or legal process, thereby executing a self-help eviction. Park Plaza posted a notice on the door of the Premises stating that USMAA's "lease has been terminated" and threatening trespassing charges. A true and correct copy of the notice posted by Park Plaza is attached hereto as **Exhibit G**.

**33.** Park Plaza restricted USMAA to approximately five (5) hours to remove fifteen (15) years' worth of business equipment, fixtures, and personal property. USMAA was forced to vacate under duress. True and correct copies of the email correspondence regarding the forced removal are attached hereto as **Exhibit H**.

**34.** As a direct result of Park Plaza's self-help eviction, USMAA was forced to immediately cease all business operations at the Premises. USMAA suspended martial arts classes, froze student subscriptions, and has been unable to serve its students and the Cincinnati community from its established location.

### G. The Saba Connection and Sale Process

**35.** Paul T. Saba, Esq. of SSP Law Co., L.P.A. appeared at the January 9, 2024 hearing on the Joint Motion to Sell as counsel for Stock Yards Bank & Trust Company, the secured creditor. (See **Exhibit J**.) During the hearing, debtor's counsel described the property as having "paying tenants, stable tenant base, and is at least, I think, 70 percent or 80 percent occupied." Mr. Saba was present for this testimony.

**36.** Mr. Saba's firm, SSP Law Co., L.P.A., prepared the deeds for the sale. Hyde Park Title Agency, LLC—which is "owned and operated by the partners of the law firm SSP Law Co., L.P.A."—performed the title examination and served as the closing agent. Mr. Saba is a shareholder of SSP Law Co., L.P.A. and therefore an owner of Hyde Park Title Agency, LLC.

**37.** Mr. Saba now represents Park Plaza Holdings, LLC—the purchaser in the very transaction his firm facilitated—in opposing USMAA's Motion for Relief in the Bankruptcy Proceeding. *See* Dkt. 573, *In re Hull Organization, LLC*, Case No. 23-32983-mbn (Bankr. W.D. Ky.).

## CLAIMS FOR RELIEF

## COUNT I

## DECLARATORY JUDGMENT

### (Ohio Rev. Code § 2721.03)

**38.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**39.** An actual, justiciable controversy exists between USMAA and Park Plaza regarding the validity and enforceability of the Lease, the effect of the bankruptcy Sale Order on USMAA's leasehold interest, and the rights and obligations of the parties under the Lease.

**40.** USMAA seeks a declaration from this Court that:

(a) The Lease is a valid and enforceable agreement that survived the bankruptcy sale;

(b) Park Plaza assumed and ratified the Lease through its post-closing conduct, including acknowledging that "all leases have been assigned," reviewing USMAA's Lease, and accepting rent for nineteen consecutive months;

(c) Park Plaza waived any right to challenge the validity of the Lease through its conduct;

(d) Park Plaza's purported termination of the Lease on June 30, 2025 was wrongful and without legal basis;

(e) Park Plaza's self-help eviction of USMAA on September 5, 2025 was unlawful; and

(f) USMAA is entitled to damages for the wrongful termination of its Lease rights through the remaining term of April 30, 2030.

**41.** This declaration is necessary to establish the predicate legal determinations upon which USMAA's damage claims rest, and to prevent Park Plaza from avoiding liability by asserting the absence of a lease it previously acknowledged, ratified, and enforced.

## COUNT II

### BREACH OF LEASE AGREEMENT

**42.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**43.** The Lease (**Exhibit A**) is a valid and enforceable contract between USMAA, as Tenant, and Park Plaza, as successor-in-interest to Hull's landlord obligations.

**44.** Park Plaza assumed and ratified the obligations of the Lease by: (a) acknowledging the Lease assignment in writing (**Exhibit D**); (b) reviewing USMAA's Lease before closing; (c) collecting rent for nineteen consecutive months; and (d) demanding lease-based performance from USMAA (**Exhibit E**).

**45.** Park Plaza breached the Lease by:

(a) Wrongfully purporting to terminate the Lease effective July 30, 2025 (**Exhibit F**), without legal basis;

(b) Changing the locks on the Premises on September 5, 2025 (**Exhibit G**), and denying USMAA access to the Premises without court order or proper legal process;

(c) Forcing USMAA to vacate the Premises under duress; and

(d) Failing to provide USMAA the peaceful possession and quiet enjoyment of the Premises guaranteed under the Lease (**Exhibit A**).

**46.** As a direct and proximate result of Park Plaza's breaches, USMAA has suffered and continues to suffer damages, including but not limited to: lost profits and business income; loss of the below-market leasehold value through the remaining Lease term (through April 30, 2030); costs of relocation; loss of goodwill; loss of student base; and other consequential damages in an amount to be proven at trial.

### COUNT III

### WRONGFUL SELF-HELP EVICTION

(Violation of Ohio Law Prohibiting Self-Help Remedies)

**47.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**48.** Ohio law prohibits landlords from engaging in self-help evictions. A landlord who seeks to recover possession of leased premises must do so through judicial process. *Dillon v. Zanesville*, 2016-Ohio-2765; *Staley v. Phillips*, 2022-Ohio-2112 (2022); *State v. Dennis*, 182 Ohio App. 3d 674 (2009).

**49.** On September 5, 2025, Park Plaza changed the locks on the Premises without obtaining a court order or following any judicial process. Park Plaza posted a notice threatening USMAA with trespassing charges if USMAA attempted to enter the Premises without authorization (**Exhibit G**).

**50.** Park Plaza executed this self-help eviction while USMAA's Motion for Relief (Bankruptcy Proceeding Dkt. 554) and Motion for Stay (Bankruptcy Proceeding Dkt. 555) in the

Bankruptcy Proceeding were actively pending before the United States Bankruptcy Court for the Western District of Kentucky. Park Plaza's conduct constituted a deliberate effort to circumvent the judicial process and create facts on the ground while the matter was sub judice.

**51.** Park Plaza's self-help eviction was willful, wanton, and in reckless disregard of USMAA's rights, entitling USMAA to an award of punitive damages.

**52.** As a direct and proximate result of Park Plaza's wrongful self-help eviction, USMAA has suffered damages including loss of business operations, loss of equipment and fixtures, costs of emergency removal, and emotional distress to USMAA's principal, employees, and students.

## COUNT IV

### BREACH OF COVENANT OF QUIET ENJOYMENT

**53.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**54.** The Lease contains an implied covenant of quiet enjoyment under Ohio law, entitling USMAA to the undisturbed use and possession of the Premises during the Lease term.

**55.** Park Plaza breached the covenant of quiet enjoyment by:

(a) Issuing the wrongful Notice of Termination on June 30, 2025, creating uncertainty about USMAA's right to continued possession;

(b) Changing the locks on the Premises on September 5, 2025, physically excluding USMAA from the Premises;

(c) Threatening USMAA with trespassing charges; and

(d) Restricting USMAA to five hours to remove fifteen years' worth of belongings.

56. Park Plaza's actions constituted a constructive and actual eviction of USMAA from the Premises, entitling USMAA to damages.

## COUNT V

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

57. USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

58. USMAA maintained existing business relationships with its students, their families, instructors, and the surrounding community. These relationships generated regular and recurring revenue for USMAA's martial arts academy.

59. Park Plaza knew or should have known of USMAA's existing business relationships, as Park Plaza had served as USMAA's landlord for nineteen months, collected rent, and reviewed USMAA's Lease.

60. Park Plaza intentionally interfered with USMAA's business relationships by executing a self-help eviction that forced USMAA to immediately cease all operations, suspend classes, freeze student subscriptions, and terminate instructor relationships.

61. Park Plaza's interference was improper, as it was accomplished through unlawful self-help eviction without judicial process and while federal litigation regarding the Lease's validity was pending.

62. As a direct and proximate result of Park Plaza's tortious interference, USMAA has suffered loss of student relationships, loss of instructor relationships, loss of community goodwill, and diminished business reputation, resulting in damages in an amount to be proven at trial.

## COUNT VI

**UNJUST ENRICHMENT**

*(In the Alternative to Count II)*

**63.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**64.** In the alternative, if the Court determines that no enforceable contract exists between USMAA and Park Plaza, Park Plaza has been unjustly enriched by its receipt and retention of approximately $53,200.00 in rent payments from USMAA over approximately nineteen months.

**65.** Park Plaza received these rent payments with full knowledge that they were tendered in reliance on Park Plaza's representations that the Lease had been assigned and that USMAA's tenancy would continue.

**66.** It would be unjust and inequitable for Park Plaza to retain these funds while simultaneously denying that any landlord-tenant relationship existed. USMAA is entitled to restitution of all rent payments made to Park Plaza.

**COUNT VII**

**FRAUDULENT MISREPRESENTATION**

**67.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**68.** On February 7, 2024, Park Plaza made the following material representations to USMAA in an email with an attached Tenant Notice: (a) that "All leases have been assigned"; and (b) that "We've been reviewing your lease and your monthly rent is $2,700." (See **Exhibit D**.)

**69.** These representations were false, or alternatively, Park Plaza made these representations without regard for their truth, because Park Plaza now claims that USMAA's Lease was extinguished by the bankruptcy Sale Order entered two weeks prior to these representations.

**70.** Park Plaza knew or should have known that these representations were false, as Park Plaza was the purchaser in the very transaction it now claims extinguished USMAA's Lease.

**71.** Park Plaza made these representations with the intent that USMAA would rely upon them and continue paying rent to Park Plaza.

**72.** USMAA justifiably relied on Park Plaza's representations and continued to pay rent and operate its business at the Premises for nineteen months in reliance thereon.

**73.** As a direct and proximate result of Park Plaza's fraudulent misrepresentations, USMAA has suffered damages including rent payments made in reliance on the misrepresentations, lost business opportunities, costs of relocation, and other consequential damages in an amount to be proven at trial.

**COUNT VIII**

**PROMISSORY ESTOPPEL**

*(In the Alternative to Count II)*

**74.** USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

**75.** Park Plaza made clear and unambiguous promises to USMAA that the Lease had been assigned and that USMAA's tenancy would continue, including: (a) the Tenant Notice stating "All leases have been assigned"; (b) the email stating "We've been reviewing your lease"; and (c) Park Plaza's continued acceptance of rent for nineteen consecutive months.

76. Park Plaza reasonably expected, or should have expected, that USMAA would rely on these promises by continuing to operate its business at the Premises and making monthly rent payments.

77. USMAA did in fact rely on Park Plaza's promises to its detriment, by continuing to invest in its business at the Premises, maintaining its student base, and foregoing opportunities to secure alternative space.

78. Injustice can only be avoided by enforcing Park Plaza's promises and awarding USMAA damages for the losses sustained in reliance thereon.

## COUNT IX

## BAD FAITH AND VIOLATION OF IMPLIED COVENANT

## OF GOOD FAITH AND FAIR DEALING

79. USMAA incorporates by reference all preceding paragraphs as if fully rewritten herein.

80. Under Ohio law, "public policy dictates that every contract contains an implied duty for the parties to act in good faith and to deal fairly with each other." *Gator Dev. Corp. v. VHH, Ltd.*, 2009-Ohio-1802, ¶ 24; *see also Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 97 N.E.3d 458 (2018).

81. Park Plaza violated this covenant by:

    (a) Acknowledging the Lease assignment while simultaneously harboring the intent to disclaim it;

(b) Accepting the benefits of the landlord-tenant relationship (rent payments) for nineteen months while later denying its obligations;

(c) Demanding lease-based reimbursements from USMAA totaling $20,754.56 while simultaneously claiming no lease exists;

(d) Executing a self-help eviction while litigation regarding the Lease's validity was actively pending before a federal court; and

(e) Restricting USMAA to five hours to remove fifteen years' worth of belongings.

**82.** Park Plaza's bad faith conduct was willful, wanton, and designed to gain unfair advantage over USMAA, entitling USMAA to an award of punitive damages.

## DAMAGES

**83.** As a direct and proximate result of Park Plaza's wrongful conduct as described herein, USMAA has suffered and continues to suffer the following categories of damages:

(a) **Lost Profits and Business Income.** USMAA was forced to immediately cease all business operations at its established location, resulting in loss of revenue from student tuition, testing fees, and related income;

(b) **Loss of Below-Market Leasehold Value.** USMAA held a below-market lease running through April 30, 2030, at a rent of $2,800.00 per month. The difference between USMAA's contracted rent and the fair market rental value of comparable commercial space over the remaining lease term constitutes a quantifiable loss;

(c) **Business Interruption and Relocation Costs.** USMAA has incurred and will continue to incur costs associated with relocating its business operations, securing alternative premises, and rebuilding its customer base;

(d) **Loss of Goodwill and Business Reputation.** USMAA's forced removal from its established location has damaged its goodwill and reputation built over more than fifteen years of continuous operation in the Cincinnati community;

(e) **Loss of Student and Instructor Relationships.** USMAA has lost students, instructors, and community relationships that cannot be easily recreated at a new location;

(f) **Property Damage and Loss.** USMAA suffered loss of and damage to trade fixtures, equipment, and personal property as a result of the forced five-hour removal;

(g) **Punitive Damages.** Park Plaza's conduct was willful, wanton, and in reckless disregard of USMAA's rights, warranting an award of punitive damages to punish Park Plaza and deter similar conduct;

(h) **Attorney Fees and Costs.** USMAA is entitled to recover its reasonable attorney fees and costs incurred in prosecuting this action and in defending its leasehold rights in the Bankruptcy Proceeding; and

(i) **Pre-Judgment and Post-Judgment Interest** at the statutory rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff US Martial Arts Academy, Inc. respectfully prays that this Court:

(A) Enter a declaratory judgment that the Lease is valid and enforceable; that Park Plaza assumed, ratified, and waived any right to challenge the Lease; that Park Plaza's termination was wrongful; and that USMAA is entitled to damages for the wrongful termination of its leasehold rights through the remaining term of April 30, 2030;

(B) Award USMAA compensatory damages on each count in an amount to be determined at trial, including but not limited to lost profits, loss of below-market leasehold value, business interruption costs, relocation costs, loss of goodwill, and consequential damages;

(C) Award USMAA punitive damages in an amount sufficient to punish Park Plaza for its willful, wanton, and reckless conduct and to deter similar conduct in the future;

(D) Award USMAA restitution of all rent payments made to Park Plaza, in the alternative to contract damages;

(E) Award USMAA its reasonable attorney fees and costs incurred in this action and in the related Bankruptcy Proceeding;

(F) Award USMAA pre-judgment and post-judgment interest at the statutory rate; and

(G) Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff USMAA hereby demands a trial by jury on all issues so triable.

## EXHIBITS

The following exhibits are attached hereto and incorporated by reference:

**Exhibit A:** Retail Commercial Lease Agreement between Hull Organization, LLC and US Martial Arts Academy, Inc., dated March 1, 2020

**Exhibit B:** Letter from Receiver Cullen B. Bilyeu of Bilyeu Enterprises, LLC to Tenants of the Park Plaza Shopping Center (undated, received in or about October/November 2023)

**Exhibit C:** Sale Agreement (Irrevocable Offer to Purchase for Real Estate Assets) between Hull Organization, LLC, by and through Cullen Bilyeu of Bilyeu Enterprises, LLC as Receiver, and Buyer (Dkt. 24-1, In re Hull Organization, LLC, Case No. 23-32983-mbn (Bankr. W.D. Ky.))

**Exhibit D:** Email from Park Plaza Holdings, LLC (R. Matt Nobles) to USMAA with attached Tenant Notice, dated February 7, 2024

**Exhibit E:** Reimbursement Invoice and Correspondence from Matt Nobles / Valbridge Property Advisors to USMAA, dated on or about September 2, 2025

**Exhibit F:** Notice of Termination from Park Plaza Holdings, LLC to USMAA, dated June 30, 2025

**Exhibit G:** Notice Posted on USMAA's Door by Park Plaza Holdings, LLC, dated September 5, 2025

**Exhibit H:** Email Correspondence Regarding Forced Removal of USMAA's Property

**Exhibit I:** Order Approving the Private Sale of Collateral Free and Clear of Liens, Claims, and Encumbrances (the "Sale Order") (Dkt. 56, In re Hull Organization, LLC, Case No. 23-32983-mbn (Bankr. W.D. Ky.), entered January 23, 2024)

**Exhibit J:** Excerpt of Transcript of Hearing held January 9, 2024 (Dkt. 724, In re Hull Organization, LLC, Case No. 23-32983-mbn (Bankr. W.D. Ky.))

Respectfully submitted,

/s/ Kemal V. Catalan
Kemal V. Catalan, Esq., Ph.D.
KVC Law Firm, LLC
539 Liberty Hill
Cincinnati, Ohio 45202
Phone: (513) 549-6246
Email: kemalvcatalan@kvclawfirm.com
*Attorney for Plaintiff US Martial Arts Academy, Inc.*

# EXHIBIT A

---

Retail Commercial Lease Agreement

between Hull Organization, LLC and

US Martial Arts Academy, Inc.

dated March 1, 2020

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

This Retail Commercial Lease Agreement ("Lease") is made and effective March 1, 2020, by and between

**Hull Organization, LLC** ("Landlord")
**1902 Campus Place Suite 9**
**Louisville, KY 40299**

**Full Name: US Martial Arts ACADEMY, Inc.**

**Trade Name: US Martial Arts ACADEMY, Inc. ("Tenant")**

Landlord is the owner of land and improvements commonly known and numbered as Suite 240

**834 Ohio Pike Cincinnati Ohio, 45245**

and legally described as follows: **Park Plaza Shopping Center**

Landlord makes available for lease a portion of the Building designated as: **Suite 240 5,052 (SF)**

Landlord desires to lease the Leased Premises to Tenant, and Tenant desires to lease the Leased Premises from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

## Term

A. Landlord hereby leases the Leased Premises to Tenant, and Tenant hereby leases the same from Landlord, for an "Initial Term" beginning **March 1, 2020** and ending **April 30, 2030** with the option to cancel years 6-10 with a 180day notice prior to March 1, 2025" Lease Rental amounts below.

March 1, 2020 to February 28, 2021 Lease Rent will be $2,400.00 per month and $28,800 per year.
March 1, 2021 to February 28, 2022 Lease Rent will be $2,500.00 per month and $30,000 per year.
March 1, 2022 to February 28, 2021 Lease Rent will be $2,600.00 per month and $31,200 per year.
March 1, 2023 to February 28, 2021 Lease Rent will be $2,700.00 per month and $32,400 per year.
March 1, 2024 to February 28, 2030 Lease Rent will be $2,800.00 per month and $33,600 per year.

Each installment payment shall be due in advance on the **first day** of each calendar month during the lease term to Landlord at:

**1902 Campus Place Suite 9 Louisville, KY 40299**

or at such other place designated by written notice from Landlord or Tenant. The rental payment amount for any partial calendar months included in the lease term shall be prorated on a daily basis. Tenant shall also pay to Landlord a "Security Deposit" in the amount of $ $2,500.00

Landlord shall use its best efforts to give Tenant possession as nearly as possible at the beginning of the Lease term. If Landlord is unable to timely provide the Leased Premises, rent shall abate for the period of delay. Tenant shall make no other claim against Landlord for any such delay. Please see attached hereto as Exhibit "A"

Initials _____ / _____

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

### Late Payments

Tenant shall pay a late fee of $25.00 per day beginning with the day after the due date.

### Non-Sufficient Funds

Tenant shall be charged $35.00 for each check that is returned to landlord for lack of sufficient funds.

### Use, Sublease and Assignment

Notwithstanding the forgoing, Tenant shall not use the Leased Premises for the purposes of storing, manufacturing or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device. It should be used only for purposes of the following

### Indemnity Regarding Use of Premises

To extent permitted by law, Tenant agrees to indemnify, hold harmless, and defend Landlord from and against any and all losses, claims liabilities and expenses, including but not limited to all attorneys fees, if any which the Landlord might suffer or incur in connection with Tenant's use or misuse of the Premises

### Repairs

During the Lease term, Tenant shall make, at Tenant's expense, all necessary repairs to the Leased Premises Repairs shall include such items as routine repairs of floors, walls, ceilings, HVAC, Plumbing and other parts of the Leased Premises damaged or worn through normal occupancy

### Alterations and Improvements

Tenant, at Tenant's expense, shall have the right following Landlord's consent to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, and fasten the same to the premises. All personal property equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Lease term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Lease provided that all damage to the Leased Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

### Property Taxes

Landlord shall pay, prior to delinquency, all general real estate taxes and installments of special assessments coming due during the Lease term on the Leased Premises, and all personal property taxes with respect to Landlord's personal property, if any, on the Leased Premises. Tenant shall be responsible for paying all personal property taxes with respect to Tenant's personal property at the Leased Premises and their pro-rata share of the real estate taxes.

### Insurance

   A   If the Leased Premises or any other part of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated

Initials

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

B. Landlord shall maintain fire and extended coverage insurance on the Building and the Leased Premises in such amounts as Landlord shall deem appropriate. Tenant shall be responsible, at its expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Leased Premises.

C. Tenant and Landlord shall, each at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities of each in the Building with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $1,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. Landlord shall be listed as an additional insured on Tenant's policy or policies of comprehensive general liability insurance, and Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this Paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to expire at least (10) days prior to such expiration. Landlord shall not be required to maintain insurance against thefts within the Leased Premises or the Building.

**Utilities.**

Tenant shall pay all charges for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Leased Premises during the term of this Lease unless otherwise expressly agreed in writing by Landlord. In the event that any utility or service provided to the Leased Premises is not separately metered, Landlord shall pay the amount due and separately invoice Tenant for Tenant's pro rata share of the charges. Tenant shall pay such amounts within fifteen (15) days of invoice. Tenant acknowledges that the Leased Premises are designed to provide standard office use electrical facilities and standard office lighting. Tenant shall not use any equipment or devices that utilizes excessive electrical energy or which may, in Landlord's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

**Signs**

Following Landlord's consent, Tenant shall have the right to place on the Leased Premises, at locations selected by Tenant, any signs which are permitted by applicable zoning ordinances and private restrictions. Landlord may refuse consent to any proposed signage that is in Landlord's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Leased Premises or use of any other tenant. Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct the foregoing signs. Tenant shall repair all damage to the Leased Premises resulting from the removal of signs installed by Tenant.

**Entry**

Landlord shall have the right to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises.

**Parking**

During the term of this Lease, Tenant shall have the non-exclusive use in common with Landlord, other tenants of the Building, their guests and invitees, of the non-reserved common automobile parking areas, driveways, and footways subject to rules and regulations for the use thereof as prescribed from time to time by Landlord. Landlord reserves the right to designate parking areas within the Building or in reasonable proximity thereto, for Tenant and Tenant's agents and employees. Tenant shall provide Landlord with a list of all license numbers for the cars owned by Tenant, its agents and employees. Separated structured parking, if any, located about the Building is reserved for tenants of the

Initials _____

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

Building who rent such parking s paces. Tenant hereby leases from Landlord parking spaces in such structural parking area, such spaces to be on a first come-first served basis. In consideration of the leasing to Tenant of such spaces, Tenant shall pay a monthly rental of $0.00 per space throughout the term of the Lease. Such rental shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals

### Building Rules.

Tenant will comply with the rules of the Building adopted and altered by Landlord from time to time and will cause all of its agents, employees, invitees and visitors to do so, all changes to such rules will be sent by Landlord to Tenant in writing. The initial rules for the Building are attached hereto as Exhibit "A" and incorporated herein for all purposes

### Damage and Destruction

Subject to Section above, In the event of damage to any part of the Leased Premises, and if such damage does not render the Leased Premises unusable for Tenant's purposes, Landlord shall promptly repair such damage at the cost of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions , inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Lease term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rentals and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, for Tenant's purposes

### Default

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for five (5) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Lease ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages and the tenant would be responsible for all costs incured during such default including but not limited to all legal fees

### Quiet Possession

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease. However the tenant will take the space AS IS and will be responsible for any improvements or repairs needed including but not limited to heating and air HVAC systems, walls, paint new electrical or plumbing and ceilings

### Condemnation

If any legally, constituted authority condemns the Building or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to

Initials

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

### Subordination.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein require d to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

### Security Deposit

The Security Deposit  of $2,500.00 shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Unless otherwise provided by mandatory non-waivable law or regulation, Landlord may commingle the Security Deposit with Landlord' s other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. This security deposit shall be held and disbursed for tenant damages( if any ) as provided by law.

### Notice

Any notice required or permitted under this Lease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to Landlord to:

**1902 Campus Place Suite 9 Louisville, KY 40299  Email: rhull@hulltrust.com**

If to Tenant to  Email Address  _TESTERDA @ ROADRUNNER.COM_

Address  _50 FAWN COURT AMELIA OH 45102_

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

Initials _(signature)_

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

### Brokers

Tenant represents that Tenant was not shown the Premises by any real estate broker or agent and that Tenant has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Lease.

### Waiver

No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

### Memorandum of Lease

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

### Headings

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

### Successors

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

### Consent

Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease.

### Performance

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lesser of twelve percent (12%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the unreimbursed balance plus accrued interest to Tenant on demand.

### Compliance with Law

Initials _____

# Retail Commercial Lease Agreement
# Hull Organization, LLC

1902 Campus Place Suite 9 Louisville, KY 40299

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

**Final Agreement**

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

**Governing Law.**

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the state in which this agreement resides.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

Landlord: Hull Organization, LLC

Date: 3/17/28

Notary Public

Expires: January 12, 2022

Seal:

ASHLEY GOODLETT
NOTARY PUBLIC
Kentucky, State At Large
Commission # 593181
My Commission Expires 01/12/2022

Tenant: U.S. Martial Arts

Date: 3/10/2020

Notary Public: Elizabeth Hutchins

Expires: July 7 2024

Seal:

ELIZABETH HUTCHINS
Notary Public, State of Ohio
My Commission Expires
July 7, 2024

Initials

# EXHIBIT B

Letter from Receiver Cullen B. Bilyeu

of Bilyeu Enterprises, LLC

to Tenants of the Park Plaza Shopping Center



Dear Tenant,

As you may be aware, the property known as Park Plaza shopping center where your space is
located was placed into a court appointed receivership in October of this year. This action was
taken by the Jefferson Circuit Court in Jefferson County Kentucky following litigation involving
the primary owner of the entity which serves as your Landlord- Hull Organization LLC.

My name is Cullen Bilyeu and my company Bilyeu Enterprises LLC and I will serve as the court
appointed receiver of the property. This means that I have been placed by judicial order in
control of the Hull Organization LLC in order to manage the entity in a way that preserves the
assets it owns for the benefit of the owners, tenants, creditors, and other stakeholders.

Pursuant to the litigation as outlined in the receivership order which is attached, and at the
direction of the creditors of this property, the Park Plaza shopping center has been ordered to
be sold. As of the writing of this letter we do not have a contract or agreement to sell the
property yet. However, we will be considering offers in the coming weeks and working with a
real estate broker who will help us determine the best way to sell the property in a timely
manner.

From today's date and moving forward I will serve as the property manager and be in charge of
leasing and operations for your property. Your December rent payment should be sent payable
to "Hull Organization LLC" but mailed to my address below.

As the sale process progresses, we may be in contact with you to schedule property inspections
and/or walk throughs by prospective buyers. We will provide as much notice as possible to you
of any interruptions and we apologize in advance for any inconvenience to you.

We are attaching a tenant verification form to this letter. We ask that you please complete this
form to the best of your ability and return it to us in the preaddressed envelope with your
December rent payment. If you are able to send a copy of your most current lease or common
area charge statements that would be appreciated as well- you can submit those by email or by
US mail to our office.

If you have any questions about this process or anything relating to the property please do not
hesitate to call or email our team at 502-896-8923 or cullen@bilyeuenterprises.com.

Sincere Regards,

Cullen Bilyeu
President
Bilyeu Enterprises LLC
5057 Shelbyville Rd.
Louisville, KY 40207

Case 23-32983-mbn    Doc 813-1    Filed 03/16/26    Entered 03/16/26 12:12:30    Page 33 of 147

Entered        20-CI-500489    10/19/2023        David L. Nicholson, Jefferson Circuit Clerk

NO. 20-CI-500489                          JEFFERSON CIRCUIT COURT
                                          FAMILY DIVISION TEN (10)
                                          HON. DERWIN WEBB, JUDGE

NANCY PRUITT HULL                                          PETITIONER

v.                          **ORDER**

ROBERT ERNEST HULL                                        RESPONDENT
***** ***** ***** ***** ***** ***** ***** ***** ***** ***** *****
        Motion having been made and the Court being sufficiently advised;

**IT IS HEREBY ORDERED** that Cullen B Bilyeu shall be and hereby is appointed to serve as receiver of all business entities under Respondent's control and to oversee the management and distribution of profits of such. Said receiver shall have the authority to retain accountants, attorneys, or otherwise for the purpose of managing the entities until such time as a determination may be made with respect to the values and marital interests of the entities and how they should be sold, awarded or allocated as part of this action. The receiver's authorities and responsibilities are outlined in the Order of Appointment attached hereto.

**IT IS FURTHER ORDERED** that Respondent shall sign the listing agreement for the marital residence within twenty-four (24) hours from the entry of this Order or appear at the foot of the Court's motion docket on October 16, 2023 to show cause why he should not be found in contempt and sanctioned with incarceration until he does so.

**IT IS FURTHER ORDERED** that Respondent shall not purchase, sell or otherwise convey, for consideration or not, any Properties, real or personal, or take any steps, or fail to take any steps which have the effect of impairing the value of such property without notice to and approval of this Court.

JUDGE JEFFERSON FAMILY COURT

DATE

Entered        20-CI-500489    10/19/2023        I    David L. Nicholson, Jefferson Circuit Clerk

# EXHIBIT C

Sale Agreement

(Irrevocable Offer to Purchase for Real Estate Assets)

between Hull Organization, LLC and Buyer

(Dkt. 24-1, In re Hull Organization, LLC,

Case No. 23-32983-mbn (Bankr. W.D. Ky.))

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

In re:

HULL ORGANIZATION, LLC, *et al.*

Debtors[1]

Case No. 23-32983-acs

Chapter 11
(Jointly Administered)

---

## JOINT MOTION OF CREDITOR STOCK YARDS BANK & TRUST COMPANY, DEBTOR HULL ORGANIZATION, LLC, FOR ENTRY OF AN ORDER AUTHORIZING THE PRIVATE SALE OF COLLATERAL FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES

---

Stock Yards Bank & Trust Company ("Creditor"), and Hull Organization, LLC

("Debtor"), (at times collectively the "Movants") hereby move this Court for entry of an

order, substantially in the form tendered contemporaneously with this motion (the

"Proposed Order"), authorizing the private sale of certain real property and

improvements, identified by the Clermont County Auditor as Parcel No. 413219.018

(more commonly known as 834 SR 125, Cincinnati, Ohio 45245), Parcel No. 413219.019

(more commonly known as 830 SR 125, Cincinnati, Ohio 45245), and Parcel No.

413219.020 (located on SR 125, Cincinnati, Ohio 45245) (collectively, the "Property"), free

and clear of any liens, claims, and encumbrances. Although the Property consists of three

---

[1] The Debtors in these jointly administered bankruptcy cases and their respective case numbers are as follows: Hull Organization, LLC (23-32983-acs); Hull Equity, LLC (23-32984); Hull Properties, LLC (23-32985); and 4 West, LLC (23-32987). The Debtors' headquarters are located at 1902 Campus Place, Suite 9, Louisville, Kentucky 40299.

(3) parcels, it is one retail center and one economic unit. In support of the motion, the Movants respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. The Debtor is continuing to maintain its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"). This is a core proceeding under 28 U.S.C. § 157(b), and the Movants consent to entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 6004(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PROPOSED SALE

4.      By this motion, the Debtor seeks authority to sell all of its rights, title, and interest in the Property to Park Plaza Holdings, LLC, an Ohio Limited Liability Company that has no affiliation or connection with the Debtor (the "Purchaser") through a private sale and arms-length transaction between an unrelated buyer and seller (the "Private

2

Sale") in return for One Million Eight Hundred Twenty Five Thousand Dollars ($1,825,000.00) (the "Purchase Price"), as reflected in the sale agreement (the "Sale Agreement") attached hereto as **Exhibit A**.

5.    The purchaser's initial offer was approximately $1,600,000.00, but through the skilled negotiations of Ed Durnil, CEO & President of Tranzon Asset Advisors, a full-service real estate brokerage, the purchase price was increased to $1,825,000.00. A copy of the Broker's Listing Agreement regarding the Property is attached hereto as **Exhibit B**.[2]

6.    Stock Yards Bank asserts a security interest in the Property pursuant to a Mortgage filed of record in the office of the Clerk of Clermont County on July 18, 2019 in Mortgage Book 2812, Page 5653. Stock Yards Bank also asserts a security interest in the rents and profits derived from the Property pursuant to an Assignment of Rents and Leases filed of record in the office of the Clerk of Clermont County on July 18, 2019 in Mortgage Book 2812, Page 5672. The amount of indebtedness owed to Stock Yards Bank and secured by the Property is less than the Purchase Price.

7.    CJ Zimmer and Sons Inc. ("Zimmer") asserts a lien upon the Property pursuant to a Certificate of Judgment filed of record in the office of the Court of Common Pleas for Clermont County, Ohio on March 22, 2021, as Certificate of Judgment Number

---

[2] The Listing Agreement is between the Broker and the Court Appointed Receiver appointed by the Jefferson Circuit County Family Division Ten (10) Case No. 20-CI-500489 ("Family Court") pre-petition.

3

2021 Jud 2399. The amount of indebtedness owed to Zimmer as asserted in the Certificate of Judgment is $17,425.04, plus interest accruing at the statutory rate and costs of $465.00.

## CONSENT FOR THE SALE

8.    The Debtor believes that the Purchase Price is the best available price for the Property and does not believe that the cost and expense of running public auction or additional marketing would increase the sale proceeds.

9.    Given the Property's age, condition and deferred maintenance and based upon the fact that the negotiation occurred between unrelated parties and were conducted through a disinterested broker, creditor Stock Yards Bank believes the purchase price is the best available price for the Property.

10.    The members or interested parties of the Debtor - Robert E. Hull ("Mr. Hull") and Nancy Hull are divorced and prior to the Debtor filing its Petition, Nancy Hull filed a motion in state court seeking approval of this sale before the Jefferson Circuit County Family Division Ten (10) Case No. 20-CI-500489 ("Family Court"); had the Petition not been filed and the stay not implemented, the sale may have been approved by the Family Court and the closing likely would have occurred in early January 2024. An excerpted copy of Nancy Hull's Motion Seeking Approval of this Sale is attached hereto as Exhibit C.

4

11.     Nancy Hull's counsel has communicated to the Movants that Nancy Hull continues to consent to the sale of the Property and believes that Purchase Price is a fair and appropriate value and there is a good business reason for the sale.

12.     However, it is the Movants' understanding that Nancy Hull plans on filing a very limited objection regarding who will hold the net sale proceeds[3] of the Private Sale. To clarify, it is the Movants' understanding that Nancy Hull consents to the secured creditors being fully satisfied and consents to the real estate tax proration, conveyance fees, escrow fees and normal and customary closing expenses being paid at the real estate closing.

13.     It is the Movants' understanding that Ms. Hull's objection as it relates to the sale is premised upon her opposition to the Debtor depositing and maintaining the net sales proceeds in a Debtor in Possession Account pending further Order of this Court. However, for purposes of addressing this anticipated objection and without waiving or limiting any rights with respect to Debtor's status as debtor in possession, the Debtor notes that Ms. Hull does not have an interest in the Property, the net sales proceeds, or any of the Debtor's cash or cash equivalents. Movants acknowledge and stipulate that Debtor's ability to use the net sale proceeds and other cash collateral remains subject to further order of the Court.

---

[3] As used herein, the term "net sales proceeds" means the gross sales proceeds *less* the payoff to secured creditors, tax prorations, broker commissions, conveyance fees, taxes, escrow fees and normal and customary expenses.

## GENERAL TERMS OF SALE

14.     As reflected in the Sale Agreement, it is an all-cash offer with no contingencies and the Purchaser desires to close in January 2024 if the sale is approved. The Purchase Price is payable on the Closing Date, as defined in the Sale Agreement. The Private Sale relates to the sale of the Property only.

15.     There is a purported mechanic's lienholder, but their interest (if any) will not be prejudiced by the Private Sale, because the sale will generate sufficient proceeds to satisfy their claim, if any.

## SUMMARY OF KEY PRIVATE SALE TERMS

16.     The following is a summary of the material terms of the Sale Agreement[4]:

| Seller | Hull Organization, LLC. |
| --- | --- |
| Purchaser | Park Plaza Holdings, LLC. |
| Purchased Asset | • Clermont County Parcel No. 413219.018 (more commonly known as 834 SR 125, Cincinnati, Ohio 45245), <br><br>• Clermont County Parcel No. 413219.019 (more commonly known as 830 SR 125, Cincinnati, Ohio 45245), and <br><br>• Clermont County Parcel No. 413219.020 (located on SR 125, Cincinnati, Ohio 45245). |
| Sale Terms | The transaction effectuated pursuant to the Sale Agreement is on an as-is, where-is basis, and the Debtor makes no representations or warranties with respect to the Property. |

[4] A substantially final form of the Sale Agreement is attached hereto as **Exhibit A**. The terms of the Sale Agreement are summarized herein for the convenience of the Court and parties in interest. To the extent that there are any discrepancies, the terms of the Sale Agreement shall govern. Capitalized terms used in this summary that are not defined herein shall have the meanings ascribed to them in the Sale Agreement.

6

| Purchase Price | $1,825,000.00 |
|---|---|
| Closing | The Purchaser will pay Purchase Price on the Closing Date. |
| Transfer of Property | Following the Closing, each of the parties shall cause their authorized representatives to execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required by the title company or escrow agent to vest title to the Property in Purchaser and carry out the provisions of the Sale Agreement, and give effect to the transactions contemplated thereby, in each case at the sole cost and expense of the requesting party except to the extent that the request relates to an obligation which the other party is otherwise required to perform pursuant to the Sale Agreement. |
| Broker Commission | $109,500.00 (to be held by the Title Company pending disposition of the Application to Employ) |

## RELIEF REQUESTED

17.     By this motion, the Movants respectfully seek entry of the Proposed Order authorizing the Private Sale of the Property, free and clear of any liens, claims, and encumbrances, and granting related relief.

## BASIS FOR RELIEF

**A.     The Private Sale is a sound exercise of the Debtor's business judgment and should be approved.**

18.     11 U.S.C. § 363(b)(1) states that a "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" Before approving a sale under section 363(b)(1) of the Bankruptcy Code, the Sixth Circuit requires a debtor to show that its decision to sell the property outside of the ordinary

7

course of business was based on sound exercise of its business judgment. *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that in determining a 363(b) application, a judge must find a good business reason to grant said application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); and *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

19.    This rule shields a debtor's management decisions from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions," and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth); *In re Farmland Indus.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003) (same); *In re Lady Balt. Foods, Inc.*, 2004 Bankr. LEXIS 1413 (Bankr. D. Kan. Aug. 13, 2004) (same).

20.    Once a debtor articulates a valid business justification, the law vests its decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision, actions have been taken on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the company." *Granada Invs., Inc. v. DWG Corp.*, 823 F.Supp. 448, 454 (N.D. Ohio Apr. 26, 1993) (internal citations omitted); *see also In re Licking River Mining, LLC*, 599 B.R. 552,

8

(Bankr. E.D. Ky. 2019) (there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") (internal citations omitted). As such, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under 11 U.S.C. § 363(b)(1).

21.    Given the foregoing, the Court should grant this motion because the Property has extensive water intrusion issues due to the poor condition and age of the roof which is believed to be past its useful life and need of replacement. It has been estimated that the cost of a new replacement roof on this retail center would be approximately $250,000.00 to $300,000.00. Additionally, the surface parking lot needs to be sealed and stripped in an ADA compliant manner in the front of the Property, and in the back of the Property (also used for retail purposes) the parking lot is almost impassable without an SUV and needs extensive work. There are several tenant vacancies that will require extensive tenant improvements to secure a tenant and most transactions include a realtor's commission, which can be expensive for a five- or ten-year lease. The rental income from the Property is insufficient to cover the debt service for the foregoing capital improvements.

22.    Second, the Purchaser's creditworthiness and ability to perform on a cash basis and without a loan has been verified by Creditor Stock Yards Bank.

23.    Third, after engaging in good-faith, arms-length negotiations with the Purchaser, the parties agreed on the sale terms whereby the net sales proceeds will yield approximately $200,000.00 to the bankruptcy estate after satisfying Creditor Stock Yards Bank, the mechanic's lien holder, the broker and typical and customary closing expenses. As detailed above, the Debtor has concluded that the Purchase Price is fair and reasonable, there is a sound business reason for the Private Sale, fair and reasonable consideration will be provided, the transaction has been proposed and negotiated in good faith through a broker, and adequate and reasonable notice will have been provided. As such, the proposed Private Sale is a sound exercise of the Debtor's business judgment and should be approved. *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test).

**B.    The Proposed Private Sale is appropriate pursuant to Bankruptcy Rule 6004(f).**

24.    Fed.R.Bankr.P. 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction, and such sales are appropriate where the debtor has demonstrated that the sale is permissible pursuant to section 363 of the Bankruptcy Code. *See, e.g., Stephens Industries*, 789 F.2d at 391 (upholding the Bankruptcy Court's approval of the private sale by the debtor); *In re Pritam Realty, Inc.*, 233 B.R. 619, 624 (D. P.R. 1999) (upholding bankruptcy court order approving private sale by debtor); *In re Adamson*, 312 B.R. 16, 22 (Bankr. D. Mass. 2004) (approving private sale by debtor); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (trustee has ample authority to conduct a sale of estate property through private sale).

10

25.     The Debtor has determined that the private sale of the Property to the Purchaser is in the best interests of its estate and stakeholders. A public auction or additional marketing would require the estate to incur substantial additional costs which the Debtor cannot afford, given its scarce resources and limited liquidity. In addition, the Debtor does not believe that an auction or additional marketing would result in additional value sufficient to justify the costs. Furthermore, no other party has expressed an interest in purchasing the Property. Finally, the Purchaser has offered fair and reasonable consideration for the Property. Accordingly, the Movants submit that the private sale of the Property to the Purchaser is appropriate under the circumstances.

**C.      The Private Sale free and clear of liens and other interests is authorized by 11 U.S.C. § 363(f).**

26.     11 U.S.C. § 363(f) provides that the Court may authorize the sale of assets free and clear of any existing interests, liens, claims, and encumbrances, if:

> (a)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (b)     the entity holding the interest consents to the proposed sale;
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)     such interest is in bona fide dispute; *or*
>
> (e)     such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *(emphasis added). See also In re Old CarCo LLC,* 2010 U.S. Dist. LEXIS 143101, at *6 (S.D.N.Y. July 2, 2010).

27.     The Debtor need only satisfy one of these five requirements to permit the Property to be sold free and clear of liens and interests. *In re Wolverine Radio Co.,* 930 F.2d

1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met); *see also In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at \*12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

28.     Here Stock Yards Bank consents to the sale, and, to the extent that she has a cognizable interest in the Property, Nancy Hull consents to the sale just not the distribution of the net sales proceeds. As such, section 363(f)(5) of the Bankruptcy Code is satisfied. Furthermore, Zimmer's Certificate of Judgment and any other existing interests in the Property will be adequately protected through attachment to the proceeds of the Private Sale. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

29.     Finally, the Court may infer consent to the proposed sale from any lienholder or interest holder who does not timely object to the proposed sale. Though there is not controlling Sixth Circuit precedent, the majority of published opinions and bankruptcy treatises have concluded that consent to a fee and clear transfer under Bankruptcy Code § 363(f)(2) can be implied from an interest holder's failure to object to

the proposed non-ordinary course sale provided that adequate notice is given. *See* 3 *Collier on Bankruptcy*, ¶ 363.06[3] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013); *In re Shary*,152 B. R. 724, 725 (Bankr. N.D. Ohio 1993) ("the State's failure to object to the sale, or the confirmation of the sale, implicitly conveyed its consent to the sales as found under § 363(f)(2)") (citing *Equibank v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80 (3d Cir. 1989)); *FutureSource LLC v. Reuters Ltd.*, 312 F.2d 281, 285 (7th Cir. 2002). As such, the Movants request that the Property be transferred to the Purchaser free and clear of liens, claims, and encumbrances.

## D.   The Purchaser is a good-faith purchaser and is therefore entitled to the full protection of Section 363(m) of the Bankruptcy Code

30.   11 U.S.C. § 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]" Although good faith is not specifically defined in the Bankruptcy Code, the Second Circuit has stated that:

> Though the bankruptcy code itself does not define the term "good faith purchaser," courts have adopted the "traditional equitable definition of a 'good faith purchaser,'" defined as "one who purchases the assets for value, in good faith, and without notice of adverse claims." Thus, to be covered under the statutory protection of § 363(m), [the purchaser] must demonstrate that it purchased the [p]roperty "in good faith" and that it did so "for value."

*In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (internal quotations omitted).

13

31.     Here, the Sale Agreement and its terms are the product of good-faith, arm's-length negotiations. There is no indication of fraud or any improper insider dealing, and the consideration to be received for the Property is fair and reasonable. Accordingly, the Movants request that the Court enter an order entitling the Purchaser to the full protections of section 363(m) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h).

32.     To successfully implement the foregoing, the Movants request that the Court enter an order providing that: (i) notice of the relief requested herein satisfies Bankruptcy Rule 6004(a), and (ii) the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

33.     Notice of this motion has been given to: (a) the U.S. Trustee; (b) all parties known or reasonably believed to have asserted a lien or security interest against any of the Property; and (j) all parties who have requested service pursuant to Bankruptcy Rule 2002.

WHEREAS, the Movants respectfully request that the Court enter the Proposed Order granting the relief requested herein and such other and further relief as is just.

Respectfully submitted,

/s/ Tyler R. Yeager                         /s/ Paul T. Saba
Charity S. Bird                             Paul T. Saba (KY #95203)
Tyler R. Yeager                             STAGNARO, SABA & PATTERSON CO., L.P.A.
KAPLAN JOHNSON ABATE & BIRD LLP             2623 Erie Avenue

14

710 W. Main St., 4th Floor
Louisville, Kentucky 40202
Telephone: (502) 416-1630
Facsimile: (502) 540-8282
cbird@kaplanjohnsonlaw.com
tyeager@kaplanjohnsonlaw.com
*Proposed Counsel for Debtor*
*Hull Organization, LLC*

Cincinnati, Ohio 45208
513.533.2703
513.533.2999 (facsimile)
pts@sspfirm.com
*Attorneys for Creditor*
*Stock Yards Bank & Trust Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Joint Motion of Creditor Stock Yards Bank & Trust Company and Debtor Hull Organization, LLC for Entry of an Order Authorizing the Private Sale of Collateral Free and Clear of Liens, Claims, and Encumbrances was served on January 8, 2024 upon the U.S. Trustee and on all registered ECF Participants, electronically through the court's ECF System at the email address registered with the Court:

U.S. Trustee
Tim Ruppel, Assistant U.S. Trustee
John R. Stonitsch, Attorney for U.S. Trustee
K. Gail Russell, Attorney for Nancy Hull

And I further certify that a copy of the foregoing was served on January 8, 2024, via first-class U.S. Mail to the following addresses:

C.J. Zimmer & Sons, Inc.
c/o Reminger Service Company, Inc.
200 Public Square, Suite 1200
Cleveland, OH 44114

                              */s/ Tyler R. Yeager*
                              Tyler R. Yeager

## Exhibit A

*Sale Agreement*

## IRREVOCABLE OFFER TO PURCHASE FOR REAL ESTATE ASSETS    (the "Contract")

**Agent of the Seller:**

Durnil Realtors/Auctioneers, Inc. d/b/a Tranzon Asset Advisors (the "Agent")

All notices to be sent to: 1108-A North Dixie Highway, Elizabethtown, KY 42701. Phone: (270) 769-0284

**This is a legally binding Contract to purchase real estate, if any party does not understand any portion of this Contract, please contact competent legal counsel.**

1. The undersigned Buyer, through the Agent, hereby offers to purchase from the Seller, Hull Organization, LLC by and through Cullen Bilyeu of Bilyeu Enterprises, LLC as appointed receiver for Robert E. Hull, Case No.: 20-CI-500489, Jefferson County Circuit Court, Family Division (the "Seller"), the following described real property along with all improvements, attachments, and appurtenances; subject to normal and standard title exceptions such that any nationally recognized title company would insure and of record in Clermont County, State of Ohio.

Park Plaza Holdings LLC, an Ohio limited liability company (the "Buyer"), offers for the Property the following amount in United States funds:

**Total Sale Price:**      $1,825,000.00 (the "Total Sale Price")

**Total Deposit:**         $25,000.00 (the "Deposit")

The Total Sale Price less credit for the Total Deposit shall be paid in full with cash (certified funds or wire transfer) at or prior to settlement/closing date referenced in Section 6 of this Contract. The Buyer hereinafter tenders to Central Land Title Agency, LLC (the "Designated Escrow Agent") the sum of $25,000.00 with this Contract, which in its entirety will be the good faith escrow deposit. The disposition of the Deposit is referenced in Section 8 of this Contract.

**Property Address:** 830 & 834 Ohio Pike (aka State Route 125), Cincinnati, Claremont County, OH 45245
**Clermont County Auditor's Parcel ID:** 41-32-19-018, 41-32-19-019, and 41-32-19-020
**Legal Description:** See attached "Exhibit A"
Collectively, (the "Property")

The balance of the Total Sale Price shall be paid by the Buyer in the following manner; Buyer shall tender to the Central Land Title Agency, LLC (the "Designated Closing Agent") the balance of the Total Sale Price in cash, or equivalent, at or prior to closing. Seller will tender to Buyer a deed granting to the Buyer an unencumbered marketable title to the Property to be conveyed by Special Warranty Deed, free and clear of all liens and encumbrances, with the usual covenants such as any title company will insure, subject to easements of record, current or prior homeowner or condominium association covenants, conditions and/or restrictions, future assessments, taxes, and restrictive covenants of record as to the use and improvement of the Property. If Seller is unable to furnish marketable title, as described herein, on the date set for closing, the Buyer agrees that the Seller shall be granted a period of ninety (90) additional days from the contractual closing deadline listed in Section 6 of this Contract to cure any defects. If Seller fails to deliver unencumbered marketable title, as provided herein within the ninety (90) day timeframe outlined above, Buyer, as its sole remedy, may terminate this Contract and the Deposit shall be returned to Buyer. The sale is subject to applicable zoning or use regulations imposed by any local or state authority, but approval for use, development or subdivision is not a condition or contingency of closing.

**2. Title Insurance:** At close of escrow or contract settlement the Buyer may elect to purchase, at its expense, title insurance covering the title and transfer of the Property.

**3. Inspection by Buyer, Condition of Property and Release of Liability:** The Buyer acknowledges and agrees that the Property is being conveyed by Seller in "AS IS and WHERE IS" condition, that Buyer is fully familiar with the condition of the Property, and that the Buyer is buying the Property based solely on Buyer's knowledge and research of the Property and not in reliance on any representation made by Seller, Agent, or employee of the Seller. The Seller will not be providing any Property disclosures to the Buyer. Seller expressly disclaims any representations or warranties of any kind regarding the Property except as expressly set forth herein, including, without limitation, any representations or warranties regarding the physical condition, conformity of zoning or uses and/or any environmental compliance of the Property. Buyer releases, fully and unconditionally, the Seller and Agent from any and all liability relating to any defect or deficiency affecting said real estate; this and all other releases in this Contract shall survive the closing of this transaction, indefinitely.

Initials: _____  _____


EXHIBIT
1-A

The Buyer has made all inspections of the Property and agrees to purchase the Property "AS IS and WHERE IS", without reservation or further condition upon the Seller. The Seller and Agent grant no warranties of any kind, either expressed or implied with respect to the condition, merchantability, standards, or suitability of the Property for the Buyer. Further defined for the benefit of the Buyer; the Seller and Agent make no warranty to the environmental condition of said Property, and by signing this Contract, the Buyer fully and unconditionally releases the Seller, Agent, their employees, associates, and internal independent contractors from any and all liability regarding environmental condition.

The Property is being sold to Buyer subject to the current recorded legal description. Should the Buyer elect to have a survey conducted prior to or after close of escrow which reveals a discrepancy between the information provided by the Seller or its Agent, there will be no price or terms adjustments by the Seller. The Buyer is accepting the Property in its "AS IS and WHERE IS" condition, which is directly applicable to a survey, subdivision of the whole Property or boundary measurement of the Property including any improvements thereon.

The materials, data or other information provided to Buyer with respect to the Property, including, without limitation, any information supplied by the Agent is provided only for Buyer's convenience in making its own examination and determination with respect to the Property and, in so doing, the Buyer has relied exclusively on its own independent investigation and evaluation of every aspect of the Property prior to making an offer or bid, and not on any material or information supplied by Seller or its Agent. Buyer expressly disclaims any intent to rely on any such materials or information provided to it by Seller or Agent in connection with its inspection and review of the Property and agrees that it shall rely solely on its own independently developed or verified information.

4. **Agency Representation:** All parties acknowledge that Tranzon Asset Advisors solely represents the interests of the Seller in this transaction as Agent of the Seller. Nothing contained within this Contract, oral statements, sale memoranda, advertising, or information packages will be construed to interpret the status of the Agent as any type of agency other than Agent of the Seller.

5. **Time is of the Essence in this Contract.** Notice is hereby granted that the timelines noted in this Contract must be strictly adhered to in order to avoid a default. In the event the Buyer fails to perform according to the terms of this Contract, the Deposit will be considered forfeited as liquidated damages, not as a penalty, without delay or need for further agreement or release and applied against Seller's damages without affecting any of the Seller's further remedies it may have at law or in equity. The Designated Escrow Agent enters this Contract for the sole purpose of acknowledging its obligation of collecting and holding the Deposit and will abide by the terms and conditions of this Contract should a default or dispute arise in regard to this Contract.

> **BUYER ACKNOWLEDGES THAT THIS CONTRACT IS FOR A CASH PURCHASE AND IS NOT CONTINGENT UPON FINANCING, CONDITION OR OTHER APPROVALS; THE BUYER WILL FORFEIT ITS DEPOSIT UPON DEFAULT OF THIS CONTRACT, AND MAY INCUR OTHER SANCTIONS ALLOWED BY LAW OR IN EQUITY.**

6. **Closing and Possession:** Closing shall occur within ten (10) calendar days of final court approval. The Seller will pay for deed preparation, title search, and their own attorney fees, if any. The Buyer shall pay all other costs of closing and transfer. Buyer shall accept the possession of the Property in its current leasehold fee estate condition and acknowledges that the Property is sold subject to the rights of tenants and leases currently in effect. The Seller, as a Court Appointed Receiver of the Property cannot provide estoppel or legal verification of the leases. The Receiver will provide any and all information, leases and tenant information to the Buyer during the escrow period.

If an event constituting "Force Majeure" causes services essential for closing to be unavailable, closing date shall be extended as provided below.

**FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be liable to each other for damages so long as performance or non-performance of the obligation is disrupted, delayed, caused, or prevented by Force Majeure. "Force Majeure" means hurricanes, epidemic and/or pandemics, floods, extreme weather, earthquakes, fire, or other acts of God, unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods will be extended a reasonable time (to be interpreted as fifteen (15) calendar days) after the Force Majeure no longer prevents performance under this Contract.



Initials:

**7. Payment of Real Estate Taxes and Lease Proration:** All 2023 taxes shall be paid by the Seller. All 2024 and subsequent years taxes shall be the sole responsibility of the Buyer. All real estate taxes in default, and unpaid for prior years, if any, shall be paid by the Seller from the first proceeds of closing. All lease payments for the month in which closing is conducted shall be prorated on a thirty-day (30) basis and prorated as a credit to the Buyer and debit to the Seller as of the date of closing.

**8. Non-Refundable Deposit:** Buyer shall tendered to the Designated Escrow Agent, by wire transfer, certified funds or cash in the amount of $25,000.00 as evidence of earnest money binding this Contract. The Deposit will be held in the client trust/escrow account of the Designated Escrow Agent. All deposits are to be placed in a non-interest bearing account at a financial institution with FDIC insured accounts.

**9. Seller Default:** In the event that the Seller defaults hereunder, Buyer shall solely be entitled to a return of the Deposit. The Buyer shall not be entitled to seek damages, penalty, or specific performance from the Seller.

**10. Effective Date:** The effective date of this Contract is agreed to be the date on which the last of the parties acknowledge and enters into this Contract.

**11. Electronic Transmission:** Any copy of this Contract, either by facsimile or duplicated via electronic means and delivered to either party, shall have the same force and effect of the original document.

**12. Counterparts:** This Contract may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute the same instrument.

**13. Assignment of Contract:** This Contract is assignable by the Buyer with written notice to the Seller, its counsel, and Agent. The assignee and assignor shall be fully bound to the terms contained herein until escrow is closed.

**14. Irrevocable Offer:** This offer will remain valid, irrevocable, and available for the Seller acceptance for five (5) business days after delivery of the offer to the Seller, its counsel, or Agent. If this offer is submitted in a sale that is subject to a state or federal court action, including U.S. Bankruptcy Court, wherein court approval is required for final disposition then Seller's acceptance is fully contingent and conditioned upon the court's approval and final order, the Buyer unconditionally agrees to not withdraw, alter, or remand this Contract during the period of court approval.

**15. Risk of Loss:** All risk of loss to the Property, including physical damage or destruction to the Property or its improvements due to any cause except ordinary wear and tear and loss caused by a taking in eminent domain, shall be borne by Seller until the transaction is closed. Buyer is cautioned and requested to obtain hazard insurance to protect its equitable interest in the improvements on the Property by placing a binder of insurance on the Property upon the acknowledgement of this Contract. Should Buyer undertake to bind this Property a copy of the certificate of insurance (or similar instrument) shall be provided to the Agent without undue delay.

**16. Fair Housing and Non-Discrimination:** All parties acknowledge that this sale and transaction has been conducted without regard to race, color, national origin, religion, sex (including gender identity and sexual orientation), familial status, military status, disability, or ancestry.

**17. Venue and Procedure for Dispute Settlement:** The sole venue and exclusive jurisdiction for settlement of any and all disputes shall be the Court of Common Pleas in Claremont County, Ohio. This Agreement will be interpreted by the laws of the State of Ohio. The Buyer and Seller further agree that the prevailing party in any legal action shall have the right to be reimbursed for all costs, fees, and expenses, including, but not limited to, reasonable legal fees for enforcement or defense of its rights under this Contract. The Buyer and Seller further indemnify and release the Agent from any and all liability related to this transaction that is the subject of this Contract.

**18. This Section is Intentionally Deleted.**

**19. Survivorship of Contract:** This Contract, amendments, attachments, and codicils shall be binding on all parties, their heirs, administrators, assigns and trustees that may be assigned by previous agreement, corporate resolution and/or the binding will or estate instructions as applicable.

**20. Broker Commission Fee:** The Agent shall receive, at closing, a commission fee equal to six percent (6%) of the Total Sale Price and payment of this fee is a condition of closing.

Initials:  

3

21. 1031 Exchange: Seller and Buyer both acknowledge and agree the Buyer intends to utilize the Property as a part of a an IRS 1031 Exchange Transaction and that the Seller agrees to cooperate with the Buyer as necessary to facilitate the Buyers exchange provided such actions and cooperation does not cause a material change to the terms of this Contract or cause the Seller to incur any material expense or cost.

The undersigned Buyer and Seller agree they have read the entire contents of this Contract, they agree that all terms of this transaction are contained herein, no other agreement or contract exist and this Contract constitutes the entire and binding agreement of the parties. Both parties further acknowledge receipt of a copy of the Contract. This is a legally binding Contract; if you do not understand this Contract, consult qualified legal counsel.

---

**Receipt for Deposit, Acceptance and Acknowledgement of the forgoing Contract by the Buyer**

SELLER: Park Plaza Holdings LLC, an Ohio limited liability company

*Buyer's Signature: _____ Date: _____ Time: _____

Buyer's Printed Name: Mark D. Ayer   Title: Member

Company Name:  Park Plaza Holdings LLC

*Type of Ownership: (please check only one)
_____ CORPORATION organized under the laws of the State of _____
_____ GENERAL PARTNERSHIP organized under the laws of the State of _____
_____ LIMITED PARTNERSHIP organized under the laws of the State of _____
___X___ LIMITED LIABILITY COMPANY organized under the laws of the State of Ohio
_____ INDIVIDUAL(s) resident of the State(s) of _____
_____ OTHER (indicate type of entity and state of organization: _____

Buyer's Address: 7162 Reading Road, Suite 730, Cincinnati, Ohio 45237

Mobile: 513.608.3619; Work: 513.531.7997

Email Address: ayermark@gmail.com

---

**Acceptance of the Contract by the Seller**

The undersigned Seller agrees to accept the Buyer's offer for the Property, if this sale is conditioned upon final approval of a court of adequate jurisdiction, then the Seller's acceptance is not final until an order of the court approves the sale.

SELLER: HULL ORGANIZATION, LLC BY AND THROUGH CULLEN BILYEU OF BILYEU ENTERPRISES, LLC AS APPOINTED RECEIVER FOR ROBERT E. HULL, CASE NO.: 20-CI-500489, JEFFERSON COUNTY CIRCUIT COURT, FAMILY DIVISION

BY: _____ Date: _____ Time: _____

Name: Cullen Bilyeu    Title: Court Appointed Receiver

Address: 5057 Shelbyville Road, Louisville, KY 40207

Phone: 502.718.7696    Email: cullen@bilyeuenterprises.com

Initials:  

---

**Acceptance of Good Faith Deposit by Escrow Agent**

The Designated Escrow Agent agrees that by accepting the Buyer's non-refundable Deposit per the terms of this Contract that it agrees it will abide by all the terms and conditions affecting the Deposit and disposition of same including default by either Buyer or Seller.

BY: _____    Date: _____    Time: _____

Name: _____    Title: _____

**DESIGNATED ESCROW AND CLOSING AGENT**
Central Land Title Agency
3074 Madison Road
Cincinnati, OH 45209
Phone: 513-721-1350
Fax: 513-721-2301

**COUNSEL FOR BUYER**
W. Thomas Fisher | Shareholder
Barron Peck Bennie & Schlemmer
Oakley | 3074 Madison | Cincinnati, OH 45209
Newport | 30 East 8th Street, Suite 200 | Newport, KY 41071
WTF@bpbslaw.com | www.bpbslaw.com
P 513.533.2019 | F 888.202.1694

"Transon Asset Advisors is a member company of Transon, LLC and independently owned and operated.
Transon Asset Advisors is solely responsible for the conduct and operations of this transaction in accordance with applicable state law."

© Copyright 2013   Transon Asset Advisors   All rights reserved

Initials: [handwritten initials]                                                                    5

## EXHIBIT A
### (LEGAL DESCRIPTION)

Initials: 

6

**Exhibit B**

*Broker's Listing Agreement*



**tranzon®**

**Dated: November 28, 2023**

## REAL ESTATE COMMERCIAL LISTING AGREEMENT

In consideration of Durnil Realtors-Auctioneers, Inc. d/b/a Tranzon Asset Advisors (the "Broker") agreement to list and market the property for sale and to use its best efforts to locate a purchaser, Cullen Bilyeu of Bilyeu Enterprises, LLC as appointed receiver for Robert E. Hull, Case No.: 20-CI-500489, Jefferson County Circuit Court, Family Division (the "Seller") hereby grants the exclusive right to sell until **February 28, 2024** 11:59 P.M. (Eastern Time) to sell property located at 830 & 834 Ohio Pike (U.S. Hwy 125), Cincinnati, Claremont County, Ohio 45245 for the gross sale price of $TBD by addendum upon receipt of financial information.

If said property or any part thereof is sold before the expiration of this agreement by Broker or any other person, Seller agrees to pay Broker a commission of six percent (6%) based on the total selling price of the property; or if sold within 60 days after such expiration to any person with whom Broker has entered into negotiations with during the period of this listing. This listing agreement shall automatically extend through the closing date if the property is placed under contract to sell with a buyer and the listing agreement term expires. If property is sold the Seller agrees to convey by deed of special warranty a marketable, fee simple title, in the property such as any title company will insure, excepting easements and restrictions of record. This listing is offered without respect to race, creed, color, sex, familial status, disability or national origin. Sale of the property is conditioned upon approval by the Jefferson County, KY Circuit Court, Family Division.

The following property information will further define the subject property.

---

Building Name: Park Plaza Shopping Center   Area: [Cincinnati - Claremont County]
Address: [830 – 834 Ohio Pike]   Assessor's Parcel Numbers: 413219.018 & .019 & .020
City: [Cincinnati]   County: [Claremont]   Zip Code: [45245]
Directions: []
Deed Book: 2537   Page Number: 579
County/City combined Tax Rate: []

---

List Office: [Tranzon Asset Advisors]   Phone: [270-769-0284]
List Agent: [Edward D. Durnil]   Phone: [502-741-1331]
Co-List Agent: [N/A]   Phone: [N/A]
Owner Name: [Cullen Bilyeu of Bilyeu Enterprises, LLC as appointed receiver for Robert E. Hull, Case No.: 20-CI-500489, Jefferson County Circuit Court, Family Division]
List Date: [November 28, 2023]   Expiration Date: [February 28, 2024]
Commission to Cooperating Agent: [3 %] or [$_____]
How/When Commission Paid: [At closing/Condition of closing]

Sale Price: [$TBD]

---

| Total SqFt Listed: [TBD +/-] | Rentable SF: [_____] | Amperage: [_____] |
|---|---|---|
| Divisible: [No] | A/C Warehouse: [_____] | Parking: [__ Asph._____] |
| Total SqFt Bldg: [_____] | # Docks: [_____] | Frontage: [_____] |
| Clear (Eave) Height: [_____] | # Drive-in Doors: [_____] | Lot Dimensions: [_____] |
| # Restrooms: [_____] | No. Tenants: [_____] | Approx. Acres: [3.38ac +/-] |
| Age: [_____] | Span/Bay Size: [_____] | Floodplain: [__No_____] |
| # Floors: [_____2_____] | Rail: [_____] | Existing Zoning: [Commercial] |
| # Elevators: [____N____] | Sprinkler: [_____] | Enterprise Zone: [_____] |
| SqFt Existing Office: [_____] | Voltage: [_____] | Environmental Report Available: [_] |

| Heat Type | Floor Type | Construction | Lighting |
|---|---|---|---|
| __X__ Gas (sep mtr) | __X__ Concrete | __X__ Concrete Block | __X__Fluorescent/LED |
| ___ Electric | __X__ Wood | Pre-Engineered | ___High Pressure Sodium |

1

| Utilities | | Topography | |
|---|---|---|---|
| _X_ | AV Sanitary Sewer | _____ | Rolling |
| _X_ | AV Storm Sewer | _X_ | Level |
| _X_ | AV Water | _____ | Wooded |
| _X_ | AV Gas | _____ | Other |
| _X_ | AV Electric | | |
| _____ | AV Septic | | |
| _____ | EX Sanitary Sewer | | |
| _____ | EX Storm Sewer | | |
| _____ | EX Water | | |
| _____ | EX Gas | | |
| _____ | EX Electric | | |
| _____ | EX Septic | | |
| _____ | Other | | |

Remarks:

---

Owner's Initials. [CBB] Seller acknowledges that pursuant to this agreement and Ohio Real Estate Commission regulations that the Broker will be acting in the capacity of a seller's agent. Seller further acknowledges that the listing agent or other sales associates in the Broker's office may have a potential purchaser who would be interest in purchasing my property with the assistance of such sales associates. In this event, Broker may serve as a dual agent for the Seller and such potential purchaser or tenant, notwithstanding the fact that the commission will be paid by the Seller, and Seller will indemnify and hold harmless the Broker, its sales associates and participants of MLS from any liability, damages, costs, fees and expenses resulting from the Brokerage acting as a dual agent for the Seller and such potential purchaser.

Tranzon Asset Advisors

Cullen Bilyeu of Bilyeu Enterprises, LLC as appointed receiver for Robert E. Hull, Case No.: 20-CI-500489, Jefferson County Circuit Court, Family Division

*Edward D. Durnil*

*Cullen B. Bilyeu*

Edward D. Durnil, President
Nov. 28, 2023

Cullen B. Bilyeu, Receiver
Nov. 28, 2023

## Exhibit C

*Motion to Approve Sale filed in Jeff. Cir. Ct. 20-CI-500489*

NO. 20-CI-500489

JEFFERSON CIRCUIT COURT
FAMILY DIVISION TEN (10)
HON. DERWIN WEBB, JUDGE

NANCY PRUITT HULL                                                  PETITIONER

v.                              **NOTICE-MOTION-ORDER**

ROBERT ERNEST HULL                                              RESPONDENT

***** ***** ***** ***** ***** ***** ***** ***** ***** ***** ***** ***** *****

TO:   Su Kang                                    Justin Key
      McBrayer PLLC                              Goldberg Simpson LLC
      500 West Jefferson Street                  9301 Dayflower
      Suite 2400                                 Prospect, Kentucky 40059
      Louisville, Kentucky 40202                 Counsel for Respondent
      Counsel for Respondent                     for issues pending in
                                                 Court of Appeals

## NOTICE

Please take notice that the Petitioner, Nancy Pruitt Hull, by counsel, will tender the following motion and order on December 13, 2023 at 3:30 p.m. in the above referenced Court at the time set for the contempt hearing. The issues raised in this pleading are inextricably linked to the issues to be addressed at that time.

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing was served upon Respondent's Counsel at the above addresses by electronic filing on this 13th day of December, 2023.

_____
MARK W. DOBBINS

## PETITIONER'S MOTION TO APPROVE SALE

This Court entered an order on October 19, 2023 appointing Cullen Bilyeu as receiver to take control of certain of the parties' properties. The Court amended that Order on November 22, 2023 to include a more detailed set of directives for the receiver.

When the receiver became involved, he learned that Stock Yards Bank had ordered foreclosure proceedings to begin for the parties' property in Clermont County, Ohio, a property

1

referred to during the course of this matter as the "Ohio Pike" property.    A more detailed description is included below as Exhibit 1.

The Court may recall this property from the evidence at trial as a commercial strip center which includes a Domino's Pizza on an outlot to the property. Mr. Hull testified regarding the sale of that outlot to Domino's, among other things.

A loan from Stock Yards Bank for that property is secured by a mortgage. The loan balance is in excess of $1,400,000.

As the receiver points out in his accompanying Affidavit, sales of properties subject to foreclosure action typically do not produce an optimal sale price. The objective of a lender in a foreclosure action is to recover its loan balance, the foreclosure costs and attorneys' fees. There is no incentive for it to obtain more.

In this particular case, again as the receiver indicates, the attorney for Stock Yards Bank had identified a prospect indicating it would pay $1,600,000 to purchase the property.[1]    After negotiations between the receiver and the prospective purchaser, the sale price has been increased to $1,825,000. A sale at that level would result in net sale proceeds of perhaps $300,000. As the receiver's affidavit indicates, he has found the property to have been neglected; common area electric turned off; water service having been interrupted on a number of occasions; and rental vacancies up as a result.    Respondent has treated this property poorly, as he has the marital residence.    Delaying sale will serve no useful purpose and will cause the property to deteriorate further and to be foreclosed on.

Petitioner asks the Court to approve the purchase and sale contract between the receiver and Park Plaza Properties, LLC.  It is attached as Exhibit 1-A.

---

[1] Mr. Hull claimed at trial that the value was lower than this.

2

Respectfully submitted,

MARK W. DOBBINS
K. GAIL RUSSELL
JOANNE LYNCH
TILFORD DOBBINS SCHMIDT PLLC
1400 One Riverfront Plaza
401 W. Main Street
Louisville, Kentucky 40202
(502) 584-1000
mdobbins@tilfordlaw.com
Counsel for Petitioner

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

|  |  |
|---|---|
| In re: | Case No. 23-32983 |
| **HULL ORGANIZATION, LLC,** *et al.* | **Chapter 11**<br>**(Jointly Administered)** |
| *Debtors*[1] |  |

---

## AGREED ORDER AUTHORIZING THE PRIVATE SALE OF COLLATERAL
## FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES

---

Upon the joint motion (the "Motion") of Stock Yards Bank & Trust Company

("Creditor"), and Hull Organization, LLC ("Debtor," and at times collectively with

Creditor, the "Movants") for entry of an order authorizing the private sale of certain real

property and improvements, identified by the Clermont County Auditor as Parcel No.

413219.018 (more commonly known as 834 SR 125, Cincinnati, Ohio 45245), Parcel No.

413219.019 (more commonly known as 830 SR 125, Cincinnati, Ohio 45245), and Parcel

No. 413219.020 (located on SR 125, Cincinnati, Ohio 45245) (collectively, the "Property,"

more fully described on attached **Exhibit A**), free and clear of any liens, claims, and

encumbrances, and granting related relief, as more fully set forth in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein

---

[1] The Debtors in these jointly administered bankruptcy cases and their respective case numbers are as follows: Hull Organization, LLC (23-32983-acs); Hull Equity, LLC (23-32984); Hull Properties, LLC (23-32985); and 4 West, LLC (23-32987). The Debtors' headquarters are located at 1902 Campus Place, Suite 9, Louisville, Kentucky 40299.

pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the relief requested therein being a core proceeding as defined in 28 U.S.C. § 157(b); and due and proper notice having been given to the parties listed in the Motion, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtor, its estate, creditors and equity security holders; and upon all of the proceedings had before the Court and upon due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The Sale Agreement, together with all of the exhibits, amendments, terms, and conditions thereof, is approved.

3.      Proper, timely, adequate, and sufficient notice of the Motion was provided, and no other or further notice of the Motion or of the entry of this Order is required.

4.      All objections and responses, if any, to the sale of the Property to the Purchaser or the related relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court or by stipulation filed with the Court or pursuant to the terms of this Order, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice. All persons and entities given notice of

2

the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

5.     The sale of the Property pursuant to the Sale Agreement meets the standards for sales outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code. The sale to the Purchaser represents an exercise of the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Property and these chapter 11 cases because the terms of the sale are fair and reasonable and were negotiated in good faith and at arm's length with the Purchaser.

6.     The sale of the Property through a private sale is justified under the facts and circumstances surrounding the Property and these chapter 11 cases.

7.     The failure specifically to include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, and the Court hereby authorizes the Debtor to enter into the Sale Agreement, which is approved in its entirety.

8.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to perform its obligations under the Sale Agreement, to comply with the terms of the Sale Agreement, and to consummate the sale of the Property to the Purchaser, pursuant to and in accordance with the terms and conditions of the Sale Agreement.

9.     The Debtor is authorized to execute and deliver, and is empowered to perform under, consummate, and implement, the Sale Agreement, together with all

3

additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement, and to take all further actions as may be reasonably required for the purpose of assigning, transferring, granting, conveying and conferring the Property to the Purchaser, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Agreement.

10.    The Debtor may sell the Property free and clear of all liens, claims, and encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.

11.    The transactions contemplated by the Sale Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale of the Property to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

12.    The consideration provided by the Purchaser for the Property under the Sale Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

4

13.     The negotiations of the sale of the Property to the Purchaser were non-collusive, fair, and reasonable and conducted in good faith, and the transactions contemplated by the Sale Agreement have been bargained for and undertaken by the Debtor and the Purchaser at arm's length and without collusion, such that the sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

14.     The Property is of the character subject to *lis pendens*, the Court has jurisdiction over both the *res* and the Property, and both the *res* and the Property are sufficiently described in the Motion.

15.     Therefore, from and after the Petition Date of December 13, 2023, no interest in the Property can be acquired by third persons while this case is pending, and any purported interest in the Property acquired after the Petition Date is subject to this Order and Entry.

16.     The Purchase Price of $1,825,000.00 reflects the true fair market value of the Property, and, as such, the Property's true value in money is $1,825,000.00 as of the date of the sale.

17.     The sale of the Property at an auction will not generate a price greater than the Purchase Price of the current private Sale Agreement (the "Sale Agreement," a copy of which was attached to the Motion).

18.     The Court has authority to order the Property sold free and clear of liens.

5

19.     Pursuant to this Order, the Debtor is conveying the Property free and clear of
all claims, causes of action, demands, and liens (including the "Extinguished Liens" listed on
attached **Exhibit B**), except for the "Permitted Exceptions" defined on attached **Exhibit C**,
which will continue to run with the Property. Any allowed claims secured by the
Extinguished Liens shall be secured by liens attaching to the sale proceeds at closing to the
same extent and priority as existed prior to the Petition Date.

20.     Pursuant to section 363 of the Bankruptcy Code, upon the recording of the
deed from the Debtor to the Buyer, all of the liens and encumbrances (except the
Permitted Exceptions): (i) are canceled as to the Property, (ii) are no longer attached to
the Property, and (iii) shall be transferred to the sale proceeds and paid (if at all) in order
of priority.

21.     As indicated below, the Permitted Exceptions expressly include any real estate
taxes that are owed to the Clermont County Treasurer, which shall survive the sale and
continue to encumber the Property until fully satisfied and paid.

22.     Except for the Permitted Exceptions, the Property is being conveyed to
Buyer free and clear of all claims, demands, or obligations by any creditor of Obligor(s)
and all state, federal, or local taxes, except for real estate taxes.

23.     The sale of the Property was made in accordance with law and the Order of
this Court, the Court is satisfied with the legality of the sale, and the Court is satisfied

6

that the evidence of valuation is sufficient to establish that the Purchase Price is fair and reasonable.

24.   Upon entry of this Order, **any and all** rights of redemption are hereby terminated and extinguished, except that if the United States of America is a claimant with a valid lien on the Property and has filed a response to preserve its rights, it shall have 120 calendar days from the sale date, time being of the essence, to redeem the Property pursuant to 28 U.S.C. 2410(c), and thereafter its rights of redemption shall be null and void.

25.   Upon conveyance of the deed to the Purchaser in accordance with the Sale Agreement, the Property shall pass to Purchaser, free and clear of any and all claims, demands, liens, and encumbrances as set forth throughout this Order, except for the Permitted Exceptions. Any and all purchase agreements that may predate the Sale Agreement are null and void and terminated.

26.   The Debtor is authorized to proceed with the sale of the Property pursuant to the terms of the Sale Agreement and is authorized to execute and deliver all necessary deeds, bills of sale, and other documentation, and to take all action necessary for the transfer of the Property, free and clear of all liens, claims, and interests other than the Permitted Exceptions, pursuant to the terms of the Sale Agreement.

27.   If the Buyer fails to close on this transaction within 45 days of the date of this order (due to no fault of the Debtor), (i) the Sale Agreement is terminated, (ii) the title

7

company, escrow agent, or broker who is holding the escrow money is ordered to release and distribute the same to the Debtor as full and complete liquidated damages, and (iii) the Debtor is authorized to remarket and sell the Property to a third party on the same or substantially similar terms without further Court approval.

28. The Debtor and/or the escrow or title agent handling the sale shall make the following distributions or reserve the following amounts from the proceeds of the sale:

A. The applicable conveyance fee and/or transfer tax to the Auditor;

B. The applicable fee to record a certified copy of this Order with the Recorder;

C. The applicable fee to record a copy of the Deed with the Recorder;

D. The real estate taxes owed to the Treasurer;

E. A credit to the Purchaser for any applicable real estate tax proration in accordance with the terms of the Sale Agreement;

F. To the extent possible, the full amount due and owing to Creditor Stock Yards Bank and Trust Company;

G. To CJ Zimmer and Sons, Inc. dba Zimmer Heating and Cooling the full amount due on Certificate of Judgment 2021 JUD 2399; and

H. Durnil-Realtors Auctioneers, Inc. d/b/a Tranzon Asset Advisors ("Tranzon") claims an interest in $109,500 of the proceeds as broker's commissions under its pre-petition Listing Agreement with Bilyeu Enterprises as court-appointed receiver for the Debtor.[2] The Title Company shall hold up to $109,500 (dependent only upon availability of proceeds after making all distributions required in subparagraphs A-G) pending approval of the Application to Employ unless approved or denied prior to the Closing. All remaining excess funds, if any, shall be paid to the Debtor in the Possession pending further order of this Court.

---

[2] Nothing in this Order shall be interpreted to be a determination concerning Tranzon's allowed claim against the estate or the Court's approval of Tranzon as a professional employed by the debtor in possession.

8

29.     A certified copy of this Order shall be accepted for recording by the Clermont County, Ohio Recorder's Office, and that the Recorder shall release and discharge the Extinguished Liens listed on attached Exhibit B.

30.     The Property is being sold subject to the Permitted Exceptions defined on attached Exhibit C, which will continue to run with the Property.

31.     Nothing in this Order or the Sale Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Sale Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

32.     Nothing in this Order or the Sale Agreement or any related documents shall waive any obligation of the Debtor or any buyer or other entity to comply with applicable legal requirements and approvals under police or regulatory law governing the transfer or assignment of, or compliance with, any governmental (a) license, (b) permit, (c)

9

registration, (d) authorization, (e) approval, or (f) the discontinuation of any obligation thereunder, without compliance with **all legal** requirements under non-bankruptcy law governing such transfers or assignments.

33.     Nothing in this Order shall: (a) impair, adversely affect, or expand any right under applicable law of any governmental unit with respect to any financial assurance, letter of credit, trust, surety bond, or insurance proceeds; or (ii) limit any governmental unit in the exercise of its police or regulatory powers in accordance with 11 U.S.C. § 362(b)(4) or 28 U.S.C. § 959.

34.     Notwithstanding anything herein to the contrary, the agreement of the Debtor to the sale, and the approval by the Court of the sale of the Property, pursuant to the Sale Agreement and this Order, will not prejudice, waive, limit or impact, or be deemed to affect in any way, any party's rights, interests and legal arguments as they relate to the confirmation of the Plan.

35.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

36.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein. This Order shall be effective immediately upon entry, and the Debtor and the Purchaser are authorized to close the sale transaction

10

contemplated by the Sale Agreement immediately upon entry of this Order. Time is of the essence in closing the transaction referenced herein, and the Debtor and the Purchaser shall make reasonable efforts to close the transaction as soon as practicable.

37.    In the event of a direct conflict between the terms of this Order and the terms of (a) the Sale Agreement, or (b) any other order of this Court, the terms of this Order shall govern and control.

38.    The provisions of this Order are non-severable and mutually dependent.

39.    The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order converting the Debtor' bankruptcy cases to cases under chapter 7 of the Bankruptcy Code.

40.    The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

**IT IS SO ORDERED.**

Have seen and agreed:

/s/ Tyler R. Yeager
Charity S. Bird
Tyler R. Yeager
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, Kentucky 40202
Telephone: (502) 416-1630
Facsimile: (502) 540-8282
cbird@kaplanjohnsonlaw.com
tyeager@kaplanjohnsonlaw.com
*Proposed Counsel for Debtor*
*Hull Organization, LLC*

/s/ Paul T. Saba
Paul T. Saba (KY #95203)
STAGNARO, SABA & PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
513.533.2703
513.533.2999 (facsimile)
pts@sspfirm.com
*Attorneys for Creditor*
*Stock Yards Bank & Trust Company*

11

## EXHIBIT A—LEGAL DESCRIPTION

Parcel No. 41-32-19-020:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0° 55' 23" West along said centerline 47.46 feet; thence South 89° 45' East, 255.10 feet to the real point of beginning; thence continuing South 89° 45' East, 206.90 feet; thence South 0° 55' 23" East, 111.54 feet; thence South 8° 03' 56" West, 105.19 feet to the North line of State Route 125; thence North 67° 46' 50" West, 29.89 feet; thence 211.44 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 69° 27' 44" West, 211.38 feet; thence North 13° 35' East, 134.89 feet to the point of beginning and containing 0.889 acres of land.

SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134 and being more particularly described as follows: All of Parcel 7-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County, Ohio Recorder's Office.

The above described real estate is part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-020 on the Tax Maps of said County. Being the result of a survey and plat dated February 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-019:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0° 55' 23" West, along said centerline 47.46 feet; thence South 89° 45' East, 255.10 feet; thence South 13° 35' West 134.89 feet to the North line of State Route 125; thence along said right-of-way 171.61 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 77° 12' 00" West, 171.51 feet; thence North 37° 26' West, 58.55 feet; thence North 89° 10' West, 19.82 feet to the point of beginning and containing 0.553 acres of land.

FURTHER SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134, and being more particularly described as follows:

All of Parcel 6-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County Recorder's Office.

The above described real estate is a part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-019 on the Tax Maps of said County. Being the result of a survey and plat dated February, 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-018

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Beginning at a point in the centerline of Glen Este-Withamsville Road, North 0° 55' 23" West, 47.46 feet from the North line of the right-of-way of State Route 125; thence continuing North 0° 55' 23" West, along said centerline, 136.62 feet; thence south 89° 45' East, 225.72 feet; thence North 0° 44' 15" East, 136.62 feet; thence South 89° 45' East, 232.32 feet; thence South 0° 55' 23" East, 18.54 feet; thence South 88° 45' East 112.15 feet to an iron pipe in the Northwesterly corner of property owned by the Withamsville Church of Christ; thence along said Church line South 5° 06' 04" West, 253.62 feet; thence North 89° 45' West 85.47 feet; thence continuing North 89° 45' West 462.00 feet to the point of beginning and containing 2.759 acres of land.

All three parcels being surveyed by Fred A. Mitchell, #4189, July 5, 2001.

## EXHIBIT B—EXTINGUISHED LIENS

1.      The Mortgage in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5653 of the Clermont County, Ohio, Recorder.

2.      The Assignment of Rents in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5672 of the Clermont County, Ohio, Recorder.

3.      The Certificate of Judgment against Hull Organization, LLC and in favor of CJ Zimmer and Sons, Inc., entered on March 22, 2021, in Clermont County Common Pleas Case No. 2021 JUD 2399.

4.      The Affidavit of Facts Relating to Title recorded by Cullen Bilyeu on December 1, 2023, in O.R. 2957, page 3582 of the Clermont County, Ohio, Recorder.

## EXHIBIT C—PERMITTED EXCEPTIONS

1.      The Grant of Easement to the Cincinnati Gas & Electric Company and the Cincinnati Bell Telephone Company recorded on May 2, 1988, in Volume 52, Page 224 of the Clermont County, Ohio, Recorder.

2.      The Cincinnati Bell Telephone Company Easement recorded on November 9, 1993, in O.R. 423, Page 98, on November 9, 1993 of the Clermont County, Ohio, Recorder.

3.      The Plat of Survey recorded in March, 2007.

4.      The Memorandum of Lease between B.D.M. Ventures, Inc. and AT&T Wireless PCS, Inc., recorded on June 12, 1997, in O.R. 917, Page 121 of the Clermont County, Ohio, Recorder.

5.      The Memorandum of Assignment between Cincinnati Bell Wireless, LLC and Red Spires Asset Sub, LLC, recorded on May 28, 2010, in O.R. 2244, Page 800 of the Clermont County, Ohio, Recorder.

6.      The Assignment between Red Spires Asset Sub, LLC, and American towers LLC recorded on April 30, 2019, in O.R. 2806, Page 3757 of the Clermont County, Ohio, Recorder.

7.      The Memorandum of Easement and Assignment by and between Hull Organization, LLC and AP Wireless Investments I, LLC, which was recorded on May 7, 2015, in O.R. 2573, Page 565, of the Clermont County, Ohio, Recorder.

From: Matt Nobles rmnobles@valbridge.com 
Subject: Park Plaza closing
Date: February 7, 2024 at 11:09 AM
To: lesterda@roadrunner.com

Good morning – the closing on the property is scheduled for 3:30PM today. Attached is the tenant notice.

We've been reviewing your lease and your monthly rent is $2,700. Please send February rent to the address listed on the notice.

If you have any questions – please call – more information for plans on the property to follow.

 **Valbridge**
PROPERTY ADVISORS

## R. Matt Nobles, MAI, AI-GRS

Managing Director
Valbridge Property Advisors | Cincinnati

**PLEASE NOTE NEW ADDRESS**

8298 Clough Pike, Suite 1
Cincinnati, Ohio 45244
Office: 513.785.0820
Mobile: 513.218.1156
Fax: 502.589.7480



*National Coverage. Local Knowledge. Valuation Independence.*

# EXHIBIT E

---

Reimbursement Invoice and Correspondence

from Matt Nobles / Valbridge Property Advisors

to USMAA

dated on or about September 2, 2025



# INVOICE

NC Real Estate Services, Inc
P.O. Box 54411
Cincinnati, OH 45254-0411
EIN #61-1353369
513-218-1156

Tenant : U.S. Martial Arts
Tenant Space : 5,052 square feet
Invoice Date : 9/2/2025
Customer ID : Park Plaza

| | | | | |
|---|---|---|---|---|
| 2024 Reimbursement | 2024 Reimbursement per lease (2/1/24-12/31/214) | $2.14 per square foot | $ | 10,811.28 |
| 2024 Repairs | 2024 HVAC repairs (7/7/24 & 9/9/24) | $115.00 & $280.00 | $ | 395.00 |
| 2025 Reimbursement | 2025 Reimbursement per lease (1/1/25 - 8/31/2025) | $1.89 per square foot | $ | 9,548.28 |

|  |  |  |
|---|---|---|
| Subtotal | $ | 20,754.56 |
| **TOTAL** | $ | 20,754.56 |

**TOTAL IS DUE 15 DAYS FROM INVOICE DATE**

Make all check payment payable to Park Plaza Holdings, LLC

Send payment to P.O. Box 54411, Cincinnati, Ohio 45254-0411

**THANK YOU FOR YOUR BUSINESS!**

# EXHIBIT F

Notice of Termination

from Park Plaza Holdings, LLC to USMAA

dated June 30, 2025

# Park Plaza Holdings, LLC

June 30, 2025

<u>**VIA HAND DELIVERY**</u>

David Tester
**US Martial Arts Academy, Inc.**
**834 Ohio Pike, Unit 240**
**Cincinnati, Ohio 45245**

   **Re:** *<u>Notice of Termination</u>*

Dear Tenant,

  The purpose of this correspondence is to notify you that your rights as a tenant at sufferance or month-to-month tenant are hereby terminated effective July 30, 2025, time being of the essence.

  While you may be under the mistaken belief that your lease with the prior landlord, Hull Organization, LLC, survived its bankruptcy, it did not. As you may remember, all the tenants located at the shopping center complex located at 834 SR 125, Cincinnati, Ohio 45245 (the "Property") were notified that a receiver was appointed to manage the Property and that Hull Organization, LLC., the former owner of the Property filed bankruptcy. As part of the bankruptcy process, the Property was sold to the current owner, Park Plaza, LLC., and all the leases, with the exception of one lease with ATT, were expressly terminated pursuant to the enclosed Bankruptcy Court Order.

  The relevant paragraphs of the Bankruptcy Court Order are as follows AT&T lease, though (see page 16, #4 & Exhibit C)

10.    The Debtor may sell the Property free and clear of all liens, claims, and encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) and (h) of the Bankruptcy Code have been satisfied and all interested parties consent to the sale. As more fully Ordered below, the net sales proceeds from the sale shall be held by held by Trustee Michael Wheatley pending further Order from this Court. .

20.    Pursuant to section 363 of the Bankruptcy Code, upon the recording of the deed from the Debtor to the Buyer, all of the liens and encumbrances (except the Permitted Exceptions): (i) are canceled as to the Property, (ii) are no longer attached to the Property, and (iii) shall be transferred to the sale proceeds and paid (if at all) in order of priority.

25.    Upon conveyance of the deed to the Purchaser in accordance with the Sale Agreement, the Property shall pass to Purchaser, free and clear of any and all claims, demands, liens, and encumbrances as set forth throughout this Order, except for the Permitted Exceptions. Any and all purchase agreements that may predate the Sale Agreement are null and void and terminated.

The Permitted Exceptions are expressly identified on page 16 of the Order, on Exhibit C, and since your prior lease agreement is not listed on Exhibit C, it was terminated as part of the Bankruptcy Order and did not survive the sale. Upon being terminated, your lease became a month-to-month lease and your tenancy became a tenant at sufferance, subject to termination by the new owner.

Therefore, the purpose of this correspondence is to notify the Tenant that its right to occupy the Property and the Leased Premises terminates on July 30, 2025, time being of the essence and should the Tenant attempt to remain on the Property after that time, Park Plaza Holdings, LLC will exercise all of its rights and remedies to remove the

Sincerely,

Park Plaza Holdings, LLC

By: _R. Matt Nobles_

R. Matt Nobles

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

In re:

**HULL ORGANIZATION, LLC**, *et al.*

Debtors[1]

Case No. 23-32983

Chapter 11
(Jointly Administered)

---

## ORDER AUTHORIZING THE PRIVATE SALE OF COLLATERAL FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES

---

This matter having come before the Court on the joint motion (the "Motion") of

Stock Yards Bank & Trust Company ("Creditor"), and Hull Organization, LLC ("Debtor,"

and at times collectively with Creditor, the "Movants") for entry of an order authorizing

the private sale of certain real property and improvements, identified by the Clermont

County Auditor as Parcel No. 413219.018 (more commonly known as 834 SR 125,

Cincinnati, Ohio 45245), Parcel No. 413219.019 (more commonly known as 830 SR 125,

Cincinnati, Ohio 45245), and Parcel No. 413219.020 (located on SR 125, Cincinnati, Ohio

45245) (collectively, the "Property," more fully described on attached **Exhibit A**), free and

clear of any liens, claims, and encumbrances, and granting related relief, as more fully set

forth in the Motion; and the Court having jurisdiction to consider the Motion and the

---

[1] The Debtors in these jointly administered bankruptcy cases and their respective case numbers are as follows: Hull Organization, LLC (23-32983-acs); Hull Equity, LLC (23-32984); Hull Properties, LLC (23-32985); and 4 West, LLC (23-32987). The Debtors' headquarters are located at 1902 Campus Place, Suite 9, Louisville, Kentucky 40299.

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the relief requested therein being a core proceeding as defined in 28 U.S.C. § 157(b); and due and proper notice having been given to the parties listed in the Motion, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the matter having been properly noticed for Objections and Nancy Hull, by counsel, having filed a Limited Objection which is addressed herein as to the holding of any remaining sale funds for further determination as to the rightful recipient of same, and it appearing that the relief requested in the Motion is in the best interest of the Debtor, its estate, creditors and equity security holders; and upon all of the proceedings had before the Court and upon due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED as set forth herein.

2.    The Sale Agreement, together with all of the exhibits, amendments, terms, and conditions thereof, is approved.

3.    Proper, timely, adequate, and sufficient notice of the Motion was provided, and no other or further notice of the Motion or of the entry of this Order is required.

2

4.    All objections and responses, if any, to the sale of the Property to the Purchaser or the related relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court or by stipulation filed with the Court or pursuant to the terms of this Order, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

5.    The sale of the Property pursuant to the Sale Agreement meets the standards for sales outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code. The sale to the Purchaser represents an exercise of the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Property and these chapter 11 cases because the terms of the sale are fair and reasonable and were negotiated in good faith and at arm's length with the Purchaser.

6.    The sale of the Property through a private sale is justified under the facts and circumstances surrounding the Property and these chapter 11 cases.

7.    The failure specifically to include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, and the Court hereby authorizes the Debtor to enter into the Sale Agreement, which is approved in its entirety.

3

8.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to perform its obligations under the Sale Agreement, to comply with the terms of the Sale Agreement, and to consummate the sale of the Property to the Purchaser, pursuant to and in accordance with the terms and conditions of the Sale Agreement.

9.      The Debtor is authorized to execute and deliver, and is empowered to perform under, consummate, and implement, the Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement, and to take all further actions as may be reasonably required for the purpose of assigning, transferring, granting, conveying and conferring the Property to the Purchaser, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Agreement.

10.     The Debtor may sell the Property free and clear of all liens, claims, and encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) and (h) of the Bankruptcy Code have been satisfied and all interested parties consent to the sale. As more fully Ordered below, the net sales proceeds from the sale shall be held by held by Trustee Michael Wheatley pending further Order from this Court. .

11.     The transactions contemplated by the Sale Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided

4

herein to consummate the sale shall not affect the validity of the sale of the Property to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

12.    The consideration provided by the Purchaser for the Property under the Sale Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

13.    The negotiations of the sale of the Property to the Purchaser were non-collusive, fair, and reasonable and conducted in good faith, and the transactions contemplated by the Sale Agreement have been bargained for and undertaken by the Debtor and the Purchaser at arm's length and without collusion, such that the sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

14.    The Property is of the character subject to *lis pendens*, the Court has jurisdiction over both the *res* and the Property, and both the *res* and the Property are sufficiently described in the Motion.

15.    Therefore, from and after the Petition Date of December 13, 2023, no interest in the Property can be acquired by third persons while this case is pending, and any purported interest in the Property acquired after the Petition Date is subject to this Order and Entry.

16.     The Purchase Price of $1,825,000.00 reflects the true fair market value of the Property, and, as such, the Property's true value in money is $1,825,000.00 as of the date of the sale.

17.     The sale of the Property at an auction will not generate a price greater than the Purchase Price of the current private Sale Agreement (the "Sale Agreement," a copy of which was attached to the Motion).

18.     The Court has authority to order the Property sold free and clear of liens.

19.     Pursuant to this Order, the Debtor is conveying the Property free and clear of all claims, causes of action, demands, and liens (including the "Extinguished Liens" listed on attached Exhibit B), except for the "Permitted Exceptions" defined on attached Exhibit C, which will continue to run with the Property. Any allowed claims secured by the Extinguished Liens shall be secured by liens attaching to the sale proceeds at closing to the same extent and priority as existed prior to the Petition Date.

20.     Pursuant to section 363 of the Bankruptcy Code, upon the recording of the deed from the Debtor to the Buyer, all of the liens and encumbrances (except the Permitted Exceptions): (i) are canceled as to the Property, (ii) are no longer attached to the Property, and (iii) shall be transferred to the sale proceeds and paid (if at all) in order of priority.

6

21.    As indicated below, the Permitted Exceptions expressly include any real estate taxes that are owed to the Clermont County Treasurer, which shall survive the sale and continue to encumber the Property until fully satisfied and paid.

22.    Except for the Permitted Exceptions, the Property is being conveyed to **Buyer free and clear of all claims, demands, or obligations by any creditor of Obligor(s) and all state, federal, or local taxes, except for real estate taxes.**

23.    The sale of the Property was made in accordance with law and the Order of this Court, the Court is satisfied with the legality of the sale, and the Court is satisfied that the evidence of valuation is sufficient to establish that the Purchase Price is fair and reasonable.

24.    Upon entry of this Order, any and all rights of redemption are hereby terminated and extinguished, except that if the United States of America is a claimant with a valid lien on the Property and has filed a response to preserve its rights, it shall have 120 calendar days from the sale date, time being of the essence, to redeem the Property pursuant to 28 U.S.C. 2410(c), and thereafter its rights of redemption shall be null and void.

25.    Upon conveyance of the deed to the Purchaser in accordance with the Sale Agreement, the Property shall pass to Purchaser, free and clear of any and all claims, demands, liens, and encumbrances as set forth throughout this Order, except for the

7

Permitted Exceptions. Any and all purchase agreements that may predate the Sale
Agreement are null and void and terminated.

26.     The Debtor is authorized to proceed with the sale of the Property pursuant
to the terms of the Sale Agreement and is authorized to execute and deliver all necessary
deeds, bills of sale, and other documentation, and to take all action necessary for the
transfer of the Property, free and clear of all liens, claims, and interests other than the
Permitted Exceptions, pursuant to the terms of the Sale Agreement.

27.     If the Buyer fails to close on this transaction within 45 days of the date of
this order (due to no fault of the Debtor), (i) the Sale Agreement is terminated, (ii) the title
company, escrow agent, or broker who is holding the escrow money is ordered to release
and distribute the same to the Debtor as full and complete liquidated damages, and (iii)
the Debtor is authorized to remarket and sell the Property to a third party on the same or
substantially similar terms without further Court approval.

28.     At least 24 hours prior to closing, all counsel or parties of interest shall have
the right to review the settlement statement. If the settlement statements contains
expenses that are not listed in Paragraph 29 below (A through H), and counsel objects to
those other expenses, the Title Company shall hold in escrow the funds associated with
those expenses until further Order of this Court.

29.     The escrow or title agent handling the sale shall make the following
distributions or reserve the following amounts from the proceeds of the sale:

8

A.     The applicable conveyance fee and/or transfer tax to the Auditor;

B.     The applicable fee to record a certified copy of this Order with the Recorder;

C.     The applicable fee to record a copy of the Deed with the Recorder;

D.     The real estate taxes owed to the Treasurer;

E.     A credit to the Purchaser for any applicable real estate tax proration in accordance with the terms of the Sale Agreement;

F.     To the extent possible, the full amount due and owing to Creditor Stock Yards Bank and Trust Company;

G.     To CJ Zimmer and Sons, Inc. dba Zimmer Heating and Cooling the full amount due on Certificate of Judgment 2021 JUD 2399; and

H.     Durnil-Realtors Auctioneers, Inc. d/b/a Tranzon Asset Advisors ("Tranzon") claims an interest as broker's commissions under its pre-petition Listing Agreement with the Debtor, [2] in the amount of $109,500.00 but to be held by the Title Company pending approval of the Application to Employ unless approved or denied prior to the Closing. [3]

I.     After paying the expenses in paragraph A through H above, if there are any remaining proceeds from the sale the Title Company shall transfer the same to Trustee Michael Wheatley who shall hold same pending further order of this Cour. .

30.     Nothing in this Order shall in any way be constructed as a waiver of any of the Parties' rights, claims or interest.

31.     A certified copy of this Order shall be accepted for recording by the Clermont County, Ohio Recorder's Office, and that the Recorder shall release and discharge the Extinguished Liens listed on attached Exhibit B.

---

[2] Nothing in this Order shall be interpreted to be a determination concerning Tranzon's allowed claim against the estate or the Court's approval of Tranzon as a professional employed by the debtor in possession.

[3]

9

32.     The Property is being sold subject to the Permitted Exceptions defined on attached **Exhibit C**, which will continue to run with the Property.

33.     Nothing in this Order or the Sale Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Sale Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

34.     Nothing in this Order or the Sale Agreement or any related documents shall waive any obligation of the Debtor or any buyer or other entity to comply with applicable legal requirements and approvals under police or regulatory law governing the transfer or assignment of, or compliance with, any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) approval, or (f) the discontinuation of any obligation thereunder, without compliance with all legal requirements under non-bankruptcy law governing such transfers or assignments.

10

35.     Nothing in this Order shall: (a) impair, adversely affect, or expand any right

under applicable law of any governmental unit with respect to any financial assurance,

letter of credit, trust, surety bond, or insurance proceeds; or (ii) limit any governmental

unit in the exercise of its police or regulatory powers in accordance with 11 U.S.C. §

362(b)(4) or 28 U.S.C. § 959.

36.     Notwithstanding anything herein to the contrary, the agreement of the

Debtor to the sale, and the approval by the Court of the sale of the Property, pursuant to

the Sale Agreement and this Order, will not prejudice, waive, limit or impact, or be

deemed to affect in any way, any party's rights, interests and legal arguments as they

relate to the confirmation of the Plan.

37.     The Debtor is authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

38.     This Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly

finds that there is no just reason for delay in the implementation of this Order, and expressly

directs entry of judgment as set forth herein. This Order shall be effective immediately upon

entry, and the Debtor and the Purchaser are authorized to close the sale transaction

contemplated by the Sale Agreement immediately upon entry of this Order. Time is of the

essence in closing the transaction referenced herein, and the Debtor and the Purchaser shall

make reasonable efforts to close the transaction as soon as practicable.

11

39.     In the event of a direct conflict between the terms of this Order and the terms of (a) the Sale Agreement, or (b) any other order of this Court, the terms of this Order shall govern and control.

40.     The provisions of this Order are non-severable and mutually dependent.

41.     The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order converting the Debtor' bankruptcy cases to cases under chapter 7 of the Bankruptcy Code.

42.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

IT IS SO ORDERED.

Alan C. Stout
United States Bankruptcy Judge
Dated: January 23, 2024

12

## EXHIBIT A—LEGAL DESCRIPTION

Parcel No. 41-32-19-020:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0°55' 23" West along said centerline 47.46 feet; thence South 89°45' East, 255.10 feet to the real point of beginning; thence continuing South 89°45' East, 206.90 feet; thence South 0°55' 23" East, 111.54 feet; thence South 8°03' 56" West, 105.19 feet to the North line of State Route 125; thence North 67°46' 50" West, 29.89 feet; thence 211.44 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 69°27' 44" West, 211.38 feet; thence North 13°35' East, 134.89 feet to the point of beginning and containing 0.889 acres of land.

SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134 and being more particularly described as follows: All of Parcel 7-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County, Ohio Recorder's Office.

The above described real estate is part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-020 on the Tax Maps of said County. Being the result of a survey and plat dated February 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-019:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0°55' 23" West, along said centerline 47.46 feet; thence South 89°45' East, 255.10 feet; thence South 13°35' West 134.89 feet to the North line of State Route 125; thence along said right-of-way 171.61 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 77°12' 00" West, 171.51 feet; thence North 37°26' West, 58.55 feet; thence North 89°10' West, 19.82 feet to the point of beginning and containing 0.553 acres of land.

FURTHER SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134, and being more particularly described as follows:

All of Parcel 6-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County Recorder's Office.

The above described real estate is a part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-019 on the Tax Maps of said County.  Being the result of a survey and plat dated February, 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-018

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Beginning at a point in the centerline of Glen Este-Withamsville Road, North 0° 55' 23" West, 47.46 feet from the North line of the right-of-way of State Route 125; thence continuing North 0° 55' 23" West, along said centerline, 136.62 feet; thence south 89° 45' East, 225.72 feet; thence North 0° 44' 15" East, 136.62 feet; thence South 89° 45' East, 232.32 feet; thence South 0° 55' 23" East, 18.54 feet; thence South 88° 45' East 112.15 feet to an iron pipe in the Northwesterly corner of property owned by the Withamsville Church of Christ; thence along said Church line South 5° 06' 04" West, 253.62 feet; thence North 89° 45' West 85.47 feet; thence continuing North 89° 45' West 462.00 feet to the point of beginning and containing 2.759 acres of land.

All three parcels being surveyed by Fred A. Mitchell, #4189, July 5, 2001.

## EXHIBIT B—EXTINGUISHED LIENS

1.     The Mortgage in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5653 of the Clermont County, Ohio, Recorder.

2.     The Assignment of Rents in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5672 of the Clermont County, Ohio, Recorder.

3.     The Certificate of Judgment against Hull Organization, LLC and in favor of CJ Zimmer and Sons, Inc., entered on March 22, 2021, in Clermont County Common Pleas Case No. 2021 JUD 2399.

4.     The Affidavit of Facts Relating to Title recorded by Cullen Bilyeu on December 1, 2023, in O.R. 2957, page 3582 of the Clermont County, Ohio, Recorder.

## EXHIBIT C—PERMITTED EXCEPTIONS

1.    The Grant of Easement to the Cincinnati Gas & Electric Company and the Cincinnati Bell Telephone Company recorded on May 2, 1988, in Volume 52, Page 224 of the Clermont County, Ohio, Recorder.

2.    The Cincinnati Bell Telephone Company Easement recorded on November 9, 1993, in O.R. 423, Page 98, on November 9, 1993 of the Clermont County, Ohio, Recorder.

3.    The Plat of Survey recorded in March, 2007.

4.    The Memorandum of Lease between B.D.M. Ventures, Inc. and AT&T Wireless PCS, Inc., recorded on June 12, 1997, in O.R. 917, Page 121 of the Clermont County, Ohio, Recorder.

5.    The Memorandum of Assignment between Cincinnati Bell Wireless, LLC and Red Spires Asset Sub, LLC, recorded on May 28, 2010, in O.R. 2244, Page 800 of the Clermont County, Ohio, Recorder.

6.    The Assignment between Red Spires Asset Sub, LLC, and American towers LLC recorded on April 30, 2019, in O.R. 2806, Page 3757 of the Clermont County, Ohio, Recorder.

7.    The Memorandum of Easement and Assignment by and between Hull Organization, LLC and AP Wireless Investments I, LLC, which was recorded on May 7, 2015, in O.R. 2573, Page 565, of the Clermont County, Ohio, Recorder.

# EXHIBIT G

---

Notice Posted on USMAA's Door

by Park Plaza Holdings, LLC

dated September 5, 2025



# NOTICE

SEPTEMBER 5, 2005

TO THE USMAA:

Your lease has been terminated and are no longer permitted to occupy the premises. Please arrange for your personal property to be removed by calling (513)600-XXXX and make arrangements at time with movers to vacate the space.

Any attempt to enter the premises without calling the above number and arranging the removal of items of personal property will be considered trespassing and charges will be filed.

PARK PLAZA HOLDINGS LLC

# EXHIBIT H

---

Email Correspondence Regarding

Forced Removal of USMAA's Property

**From:** **Kemal Catalan** kemalvcatalan@kvclawfirm.com 
**Subject:** Re: USMAA forced eviction
**Date:** September 11, 2025 at 7:14 AM
**To:** Paul T. Saba Esq. pts@sspfirm.com

Thank you Paul.

Kemal V. Catalan, Esq., Ph.D.
KVC Law Firm
513-549-6246
KemalVCatalan@kvclawfirm.com
www.kvclawfirm.com

> On Sep 11, 2025, at 1:59 AM, Paul T. Saba, Esq, <pts@sspfirm.com> wrote:

Kemal,
Your client only has a small amount of items that need to be removed – some matts affixed to the walls that can easily be removed, a small amount of office furniture, and decorative items on the walls so five hours should be more than sufficient but if you should need more time and as long as your client is making good progress moving out, the landlord will be flexible and extend the time an hour if needed.

Paul T. Saba, Esq.                          <Image.png>
SSP Law Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208                      <Image.png>
Direct Dial: 513.533.2703
Main Fax: 513.533.2999                      <Image.jpeg>
pts@sspfirm.com
http://www.sspfirm.com

This e-mail transmission contains information that is intended to be privileged and confidential. It is intended only for the addressee named above. If you receive this e-mail in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please erase it from your computer system. Your assistance in correcting this error is appreciated.

---

**From:** Kemal Catalan <kemalvcatalan@kvclawfirm.com>
**Sent:** Wednesday, September 10, 2025 5:04:41 PM
**To:** Paul T. Saba, Esq. <pts@sspfirm.com>
**Subject:** USMAA forced eviction

Good morning Paul,

Not sure if you were aware that this past Friday (Sep 5) Park Plaza took a self help measure to evict by changing the locks on USMAA. I suppose Park Plaza could not wait to resolve the matter in court or provide proper 3 day Notice to Vacate? Nonetheless, USMAA is reluctantly forced into moving, and arranged to remove its trade fixtures and personal property Saturday. Park Plaza has indicated to my client that it is only allotting 5 hours for the move. Restricting my client from taking reasonable time to remove property seems a bit harsh, don't you think? If you would not mind asking your client to give USMAA reasonable time and flexibility to move since it is already restricting free access to move out would be greatly appreciated.

I know that you are out of the country, and will call your firm to see if there is someone you directed urgent matters to; I will make the same request. I just wanted to keep you in the loop. If there is someone that you want to direct me to, let me know.

Kemal V. Catalan, Esq. Ph.D.
KVC Law Firm
513-549-6246
kemalvcatalan@kvclawfirm.com
www.kvclawfirm.com







# EXHIBIT I

Order Approving the Private Sale of Collateral

Free and Clear of Liens, Claims, and Encumbrances

(the "Sale Order")

(Dkt. 56, In re Hull Organization, LLC,

Case No. 23-32983-mbn (Bankr. W.D. Ky.)

entered January 23, 2024)

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 23-32983 |
| HULL ORGANIZATION, LLC, *et al.* | Chapter 11 (Jointly Administered) |
| *Debtors*[1] | |

## ORDER AUTHORIZING THE PRIVATE SALE OF COLLATERAL FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES

This matter having come before the Court on the joint motion (the "Motion") of

Stock Yards Bank & Trust Company ("Creditor"), and Hull Organization, LLC ("Debtor,"

and at times collectively with Creditor, the "Movants") for entry of an order authorizing

the private sale of certain real property and improvements, identified by the Clermont

County Auditor as Parcel No. 413219.018 (more commonly known as 834 SR 125,

Cincinnati, Ohio 45245), Parcel No. 413219.019 (more commonly known as 830 SR 125,

Cincinnati, Ohio 45245), and Parcel No. 413219.020 (located on SR 125, Cincinnati, Ohio

45245) (collectively, the "Property," more fully described on attached **Exhibit A**), free and

clear of any liens, claims, and encumbrances, and granting related relief, as more fully set

forth in the Motion; and the Court having jurisdiction to consider the Motion and the

---

[1] The Debtors in these jointly administered bankruptcy cases and their respective case numbers are as follows: Hull Organization, LLC (23-32983-acs); Hull Equity, LLC (23-32984); Hull Properties, LLC (23-32985); and 4 West, LLC (23-32987). The Debtors' headquarters are located at 1902 Campus Place, Suite 9, Louisville, Kentucky 40299.

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the relief requested therein being a core proceeding as defined in 28 U.S.C. § 157(b); and due and proper notice having been given to the parties listed in the Motion, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the matter having been properly noticed for Objections and Nancy Hull, by counsel, having filed a Limited Objection which is addressed herein as to the holding of any remaining sale funds for further determination as to the rightful recipient of same, and it appearing that the relief requested in the Motion is in the best interest of the Debtor, its estate, creditors and equity security holders; and upon all of the proceedings had before the Court and upon due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The Sale Agreement, together with all of the exhibits, amendments, terms, and conditions thereof, is approved.

3.      Proper, timely, adequate, and sufficient notice of the Motion was provided, and no other or further notice of the Motion or of the entry of this Order is required.

2

4.      All objections and responses, if any, to the sale of the Property to the Purchaser or the related relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court or by stipulation filed with the Court or pursuant to the terms of this Order, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

5.      The sale of the Property pursuant to the Sale Agreement meets the standards for sales outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code. The sale to the Purchaser represents an exercise of the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Property and these chapter 11 cases because the terms of the sale are fair and reasonable and were negotiated in good faith and at arm's length with the Purchaser.

6.      The sale of the Property through a private sale is justified under the facts and circumstances surrounding the Property and these chapter 11 cases.

7.      The failure specifically to include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, and the Court hereby authorizes the Debtor to enter into the Sale Agreement, which is approved in its entirety.

8.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to perform its obligations under the Sale Agreement, to comply with the terms of the Sale Agreement, and to consummate the sale of the Property to the Purchaser, pursuant to and in accordance with the terms and conditions of the Sale Agreement.

9.      The Debtor is authorized to execute and deliver, and is empowered to perform under, consummate, and implement, the Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement, and to take all further actions as may be reasonably required for the purpose of assigning, transferring, granting, conveying and conferring the Property to the Purchaser, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Agreement.

10.     The Debtor may sell the Property free and clear of all liens, claims, and encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) and (h) of the Bankruptcy Code have been satisfied and all interested parties consent to the sale. As more fully Ordered below, the net sales proceeds from the sale shall be held by held by Trustee Michael Wheatley pending further Order from this Court. .

11.     The transactions contemplated by the Sale Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided

4

herein to consummate the sale shall not affect the validity of the sale of the Property to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

12.    The consideration provided by the Purchaser for the Property under the Sale Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

13.    The negotiations of the sale of the Property to the Purchaser were non-collusive, fair, and reasonable and conducted in good faith, and the transactions contemplated by the Sale Agreement have been bargained for and undertaken by the Debtor and the Purchaser at arm's length and without collusion, such that the sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

14.    The Property is of the character subject to *lis pendens*, the Court has jurisdiction over both the *res* and the Property, and both the *res* and the Property are sufficiently described in the Motion.

15.    Therefore, from and after the Petition Date of December 13, 2023, no interest in the Property can be acquired by third persons while this case is pending, and any purported interest in the Property acquired after the Petition Date is subject to this Order and Entry.

16.     The Purchase Price of $1,825,000.00 reflects the true fair market value of the Property, and, as such, the Property's true value in money is $1,825,000.00 as of the date of the sale.

17.     The sale of the Property at an auction will not generate a price greater than the Purchase Price of the current private Sale Agreement (the "Sale Agreement," a copy of which was attached to the Motion).

18.     The Court has authority to order the Property sold free and clear of liens.

19.     Pursuant to this Order, the Debtor is conveying the Property free and clear of all claims, causes of action, demands, and liens (including the "Extinguished Liens" listed on attached **Exhibit B**), except for the "Permitted Exceptions" defined on attached **Exhibit C**, which will continue to run with the Property. Any allowed claims secured by the Extinguished Liens shall be secured by liens attaching to the sale proceeds at closing to the same extent and priority as existed prior to the Petition Date.

20.     Pursuant to section 363 of the Bankruptcy Code, upon the recording of the deed from the Debtor to the Buyer, all of the liens and encumbrances (except the Permitted Exceptions): (i) are canceled as to the Property, (ii) are no longer attached to the Property, and (iii) shall be transferred to the sale proceeds and paid (if at all) in order of priority.

21.    As indicated below, the Permitted Exceptions expressly include any real estate taxes that are owed to the Clermont County Treasurer, which shall survive the sale and continue to encumber the Property until fully satisfied and paid.

22.    Except for the Permitted Exceptions, the Property is being conveyed to Buyer free and clear of all claims, demands, or obligations by any creditor of Obligor(s) and all state, federal, or local taxes, except for real estate taxes.

23.    The sale of the Property was made in accordance with law and the Order of this Court, the Court is satisfied with the legality of the sale, and the Court is satisfied that the evidence of valuation is sufficient to establish that the Purchase Price is fair and reasonable.

24.    Upon entry of this Order, any and all rights of redemption are hereby terminated and extinguished, except that if the United States of America is a claimant with a valid lien on the Property and has filed a response to preserve its rights, it shall have 120 calendar days from the sale date, time being of the essence, to redeem the Property pursuant to 28 U.S.C. 2410(c), and thereafter its rights of redemption shall be null and void.

25.    Upon conveyance of the deed to the Purchaser in accordance with the Sale Agreement, the Property shall pass to Purchaser, free and clear of any and all claims, demands, liens, and encumbrances as set forth throughout this Order, except for the

Permitted Exceptions. Any and all purchase agreements that may predate the Sale Agreement are null and void and terminated.

26.    The Debtor is authorized to proceed with the sale of the Property pursuant to the terms of the Sale Agreement and is authorized to execute and deliver all necessary deeds, bills of sale, and other documentation, and to take all action necessary for the transfer of the Property, free and clear of all liens, claims, and interests other than the Permitted Exceptions, pursuant to the terms of the Sale Agreement.

27.    If the Buyer fails to close on this transaction within 45 days of the date of this order (due to no fault of the Debtor), (i) the Sale Agreement is terminated, (ii) the title company, escrow agent, or broker who is holding the escrow money is ordered to release and distribute the same to the Debtor as full and complete liquidated damages, and (iii) the Debtor is authorized to remarket and sell the Property to a third party on the same or substantially similar terms without further Court approval.

28.    At least 24 hours prior to closing, all counsel or parties of interest shall have the right to review the settlement statement. If the settlement statements contains expenses that are not listed in Paragraph 29 below (A through H), and counsel objects to those other expenses, the Title Company shall hold in escrow the funds associated with those expenses until further Order of this Court.

29.    The escrow or title agent handling the sale shall make the following distributions or reserve the following amounts from the proceeds of the sale:

    A.       The applicable conveyance fee and/or transfer tax to the Auditor;

    B.       The applicable fee to record a certified copy of this Order with the Recorder;

    C.       The applicable fee to record a copy of the Deed with the Recorder;

    D.       The real estate taxes owed to the Treasurer;

    E.       A credit to the Purchaser for any applicable real estate tax proration in accordance with the terms of the Sale Agreement;

    F.       To the extent possible, the full amount due and owing to Creditor Stock Yards Bank and Trust Company;

    G.       To CJ Zimmer and Sons, Inc. dba Zimmer Heating and Cooling the full amount due on Certificate of Judgment 2021 JUD 2399; and

    H.       Durnil-Realtors Auctioneers, Inc. d/b/a Tranzon Asset Advisors ("Tranzon") claims an interest as broker's commissions under its pre-petition Listing Agreement with the Debtor, [2] in the amount of $109,500.00 put to be held by the Title Company pending approval of the Application to Employ unless approved or denied prior to the Closing. [3]

    I.       After paying the expenses in paragraph A through H above, if there are any remaining proceeds from the sale the Title Company shall transfer the same to Trustee Michael Wheatley who shall hold same pending further order of this Cour. .

    30.     Nothing in this Order shall in any way be constructed as a waiver of any of the Parties' rights, claims or interest.

    31.     A certified copy of this Order shall be accepted for recording by the Clermont County, Ohio Recorder's Office, and that the Recorder shall release and discharge the Extinguished Liens listed on attached **Exhibit B**.

---

[2] Nothing in this Order shall be interpreted to be a determination concerning Tranzon's allowed claim against the estate or the Court's approval of Tranzon as a professional employed by the debtor in possession.

[3]

32.    The Property is being sold subject to the Permitted Exceptions defined on attached **Exhibit C**, which will continue to run with the Property.

33.    Nothing in this Order or the Sale Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit (as defined in section 101(27) of the Bankruptcy Code) that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Sale Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

34.    Nothing in this Order or the Sale Agreement or any related documents shall waive any obligation of the Debtor or any buyer or other entity to comply with applicable legal requirements and approvals under police or regulatory law governing the transfer or assignment of, or compliance with, any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) approval, or (f) the discontinuation of any obligation thereunder, without compliance with all legal requirements under non-bankruptcy law governing such transfers or assignments.

35.     Nothing in this Order shall: (a) impair, adversely affect, or expand any right under applicable law of any governmental unit with respect to any financial assurance, letter of credit, trust, surety bond, or insurance proceeds; or (ii) limit any governmental unit in the exercise of its police or regulatory powers in accordance with 11 U.S.C. § 362(b)(4) or 28 U.S.C. § 959.

36.     Notwithstanding anything herein to the contrary, the agreement of the Debtor to the sale, and the approval by the Court of the sale of the Property, pursuant to the Sale Agreement and this Order, will not prejudice, waive, limit or impact, or be deemed to affect in any way, any party's rights, interests and legal arguments as they relate to the confirmation of the Plan.

37.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

38.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein. This Order shall be effective immediately upon entry, and the Debtor and the Purchaser are authorized to close the sale transaction contemplated by the Sale Agreement immediately upon entry of this Order. Time is of the essence in closing the transaction referenced herein, and the Debtor and the Purchaser shall make reasonable efforts to close the transaction as soon as practicable.

39.    In the event of a direct conflict between the terms of this Order and the terms of (a) the Sale Agreement, or (b) any other order of this Court, the terms of this Order shall govern and control.

40.    The provisions of this Order are non-severable and mutually dependent.

41.    The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order converting the Debtor' bankruptcy cases to cases under chapter 7 of the Bankruptcy Code.

42.    The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

**IT IS SO ORDERED.**

Alan C. Stout
United States Bankruptcy Judge
Dated: January 23, 2024

## EXHIBIT A—LEGAL DESCRIPTION

Parcel No. 41-32-19-020:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0° 55' 23" West along said centerline 47.46 feet; thence South 89° 45' East, 255.10 feet to the real point of beginning; thence continuing South 89° 45' East, 206.90 feet; thence South 0° 55' 23" East, 111.54 feet; thence South 8° 03' 56" West, 105.19 feet to the North line of State Route 125; thence North 67° 46' 50" West, 29.89 feet; thence 211.44 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 69° 27' 44" West, 211.38 feet; thence North 13° 35' East, 134.89 feet to the point of beginning and containing 0.889 acres of land.

SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134 and being more particularly described as follows: All of Parcel 7-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County, Ohio Recorder's Office.

The above described real estate is part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-020 on the Tax Maps of said County. Being the result of a survey and plat dated February 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-019:

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Commencing at the intersection of the Northerly right-of-way of State Route 125 and the centerline of Glen Este-Withamsville Road; thence North 0° 55' 23" West, along said centerline 47.46 feet; thence South 89° 45' East, 255.10 feet; thence South 13° 35' West 134.89 feet to the North line of State Route 125; thence along said right-of-way 171.61 feet along a curve to the left, the radius of said curve being 1420.63 feet and whose chord bears North 77° 12' 00" West, 171.51 feet; thence North 37° 26' West, 58.55 feet; thence North 89° 10' West, 19.82 feet to the point of beginning and containing 0.553 acres of land.

FURTHER SAVE AND EXCEPT from the above described Parcel that portion of land conveyed by Warranty Deed recorded in Official Record 2111, page 2069, and more particularly described as follows:

Situated in Union Township, Clermont County, Ohio and in Jones Military Survey No. 1134, and being more particularly described as follows:

All of Parcel 6-WD on Plat of Survey for Clermont County Job UN-13-01, as recorded in Plat Cabinet 14, page 234 of the Clermont County Recorder's Office.

The above described real estate is a part of the same premises described as recorded in Official Record 1823, page 14 of the Clermont County, Ohio Deed Records and identified as Parcel Number 41-32-19-019 on the Tax Maps of said County. Being the result of a survey and plat dated February, 2006, made by Craig Risner P.S., Clermont County Deputy Surveyor, Ohio Reg. No. S-8024.

Parcel Number 41-32-19-018

Situated in the County of Clermont, in the State of Ohio, and in the Township of Union, in the Village of Withamsville, in Churchill Jones M.S. #1134 and further described as follows:

Beginning at a point in the centerline of Glen Este-Withamsville Road, North 0° 55' 23" West, 47.46 feet from the North line of the right-of-way of State Route 125; thence continuing North 0° 55' 23" West, along said centerline, 136.62 feet; thence south 89° 45' East, 225.72 feet; thence North 0° 44' 15" East, 136.62 feet; thence South 89° 45' East, 232.32 feet; thence South 0° 55' 23" East, 18.54 feet; thence South 88° 45' East 112.15 feet to an iron pipe in the Northwesterly corner of property owned by the Withamsville Church of Christ; thence along said Church line South 5° 06' 04" West, 253.62 feet; thence North 89° 45' West 85.47 feet; thence continuing North 89° 45' West 462.00 feet to the point of beginning and containing 2.759 acres of land.

All three parcels being surveyed by Fred A. Mitchell, #4189, July 5, 2001.

## EXHIBIT B—EXTINGUISHED LIENS

1.      The Mortgage in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5653 of the Clermont County, Ohio, Recorder.

2.      The Assignment of Rents in favor of Stock Yards Bank & Trust Company, dated June 21, 2019, and recorded on July 18, 2019, in OR 2812, page 5672 of the Clermont County, Ohio, Recorder.

3.      The Certificate of Judgment against Hull Organization, LLC and in favor of CJ Zimmer and Sons, Inc., entered on March 22, 2021, in Clermont County Common Pleas Case No. 2021 JUD 2399.

4.      The Affidavit of Facts Relating to Title recorded by Cullen Bilyeu on December 1, 2023, in O.R. 2957, page 3582 of the Clermont County, Ohio, Recorder.

## EXHIBIT C—PERMITTED EXCEPTIONS

1.     The Grant of Easement to the Cincinnati Gas & Electric Company and the Cincinnati Bell Telephone Company recorded on May 2, 1988, in Volume 52, Page 224 of the Clermont County, Ohio, Recorder.

2.     The Cincinnati Bell Telephone Company Easement recorded on November 9, 1993, in O.R. 423, Page 98, on November 9, 1993 of the Clermont County, Ohio, Recorder.

3.     The Plat of Survey recorded in March, 2007.

4.     The Memorandum of Lease between B.D.M. Ventures, Inc. and AT&T Wireless PCS, Inc., recorded on June 12, 1997, in O.R. 917, Page 121 of the Clermont County, Ohio, Recorder.

5.     The Memorandum of Assignment between Cincinnati Bell Wireless, LLC and Red Spires Asset Sub, LLC, recorded on May 28, 2010, in O.R. 2244, Page 800 of the Clermont County, Ohio, Recorder.

6.     The Assignment between Red Spires Asset Sub, LLC, and American towers LLC recorded on April 30, 2019, in O.R. 2806, Page 3757 of the Clermont County, Ohio, Recorder.

7.     The Memorandum of Easement and Assignment by and between Hull Organization, LLC and AP Wireless Investments I, LLC, which was recorded on May 7, 2015, in O.R. 2573, Page 565, of the Clermont County, Ohio, Recorder.

# EXHIBIT J

Excerpt of Transcript of Hearing

held January 9, 2024

(Dkt. 724, In re Hull Organization, LLC,

Case No. 23-32983-mbn (Bankr. W.D. Ky.))

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY (LOUISVILLE)

IN RE:                                      .    Case No. 23-32983-acs
                                            .    Chapter 7
HULL ORGANIZATION, LLC,                     .
                                            .    601 W. Broadway
                                            .    Louisville, KY 40202
                     Debtor.                .
                                            .    Tuesday, January 9, 2024
. . . . . . . . . . . . . . . . . .         .    1:20 p.m.


TRANSCRIPT OF DOC# 25 MOTION TO EXPEDITE HEARING ON JOINT
MOTION TO SELL 830 & 834 OHIO PIKE, IN ADDITION TO MOTION TO
SHORTEN TIME TO OBJECT
BEFORE THE HONORABLE ALAN C. STOUT
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtor:            Kaplan Johnson Abate & Bird, LLP
                           By:   TYLER R. YEAGER, ESQ.
                                 CHARITY BIRD, ESQ.
                           710 W. Main St., 4th Floor
                           Louisville, KY 40202
                           (502) 416-1630

For the Subchapter V       Michael E. Wheatley, Subchapter V
Trustee:                   Trustee
                           By:   MICHAEL E. WHEATLEY, ESQ.
                           P.O. Box 1072
                           Prospect, KY 40059
                           (502) 744-6484

APPEARANCES CONTINUED.

Audio Operator:            Courtroom ECRO Personnel

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
APPEARANCES (Continued):

For the United States      Office of the U.S. Trustee
Trustee:                   By:   JOHN R. STONITSCH, ESQ.
                           601 West Broadway, Suite 512
                           Louisville, KY 40202
                           (502) 582-6000

For Nancy Hull:            Tilford Dobbins & Schmidt, PLLC
                           By:  KATHERINE GAIL RUSSELL, ESQ.
                                  MARK W. DOBBINS, ESQ.
                           401 W. Main Street #1400
                           Louisville, KY 40202
                           (502) 513-0600

For Stock Yards Bank &     SSP Law Co., L.P.A.
Trust Company:             By: PAUL SABA, ESQ.
                           2623 Erie Avenue
                           Cincinnati, OH 45208
                           (513) 533-2701

Also Present:              Ed Durnil
```

1          (Proceedings commence at 1:20 p.m.)

2          THE COURT:  All right.  For Hull Organization, LLC.

3     let me hear appearances, debtor's counsel first.

4          MR. YEAGER:  Good morning, Your Honor.  Tyler Yeager

5     and Charity Bird on behalf of the four affiliated debtors.

6     Also present with us is Robert Hull, the principle of the

7     debtors in possession.

8          THE COURT:  All right.  The Subchapter V Trustee.

9          MR. WHEATLEY:  Michael Wheatley, Trustee.

10         THE COURT:  All right.  Do I hear an appearance on

11    behalf of the U.S. Trustee?

12         MR. STONITSCH:  Good afternoon, Your Honor.  John

13    Stonitsch for the U.S. Trustee.

14         THE COURT:  All right.  I'll hear appearances of

15    other parties and interests.

16         MS. RUSSELL:  Gail Russell for Nancy Hull, and I have

17    with me my partner, Mark Dobbins, who represented her in the

18    divorce action.

19         THE COURT:  All right.

20         MR. SABA:  Paul Saba on behalf of creditor Stock

21    Yards Bank.

22         THE COURT:  Thank you.  Any other parties and

23    interests in this case to enter an appearance?

24         MR. YEAGER:  Your Honor, I'll note just for the

25    record, Mr. Durnil -- Mr. Ed Durnil of Tranzon Asset Advisors

1    is also present in the courtroom.  The debtors just filed --

2    well, Hull Organization just filed the application to employ

3    Mr. Durnil's firm as related to -- as it relates to the pending

4    sale motion.

5              THE COURT:  And the Court notes it's not on the

6    docket today, but there has been an expedited motion to sell.

7              MR. YEAGER:  The expedited motion to sell was -- that

8    is on the docket for today, I believe.  I don't have the

9    printout in front of me, but the notice --

10             THE COURT:  Well, it was the motion to expedite the

11   hearing --

12             MR. YEAGER:  Oh.

13             THE COURT:  -- is on the docket.

14             MR. YEAGER:  Very well.  Okay.  Then --

15             THE COURT:  Let me hear from the debtor just with the

16   status of where we are with this case.

17             MR. YEAGER:  Thank you, Your Honor.  These four cases

18   are jointly administered.  Two of the four debtors filed under

19   Subchapter V of Chapter 11.  That's Hull Organization, the lead

20   case, and Hull Equity, the next -- the subsequent numbered

21   case.  And then the other two affiliated debtors, Hull

22   Properties and 4 West, are each a single asset real estate

23   debtor.  And because of that, they did not qualify for the

24   Subchapter V designation.

25             However, the operation as a whole, the common

1    ownership, and the overarching issues, I think, make this

2    appropriate for joint administration. And we'll be on a -- the

3    single asset real estate restrictions as far as proposing

4    adequate protection payments, making arrangements to secured

5    creditors is very closely aligned to the Subchapter V timeline

6    that requires the plan to be filed within 90 days, such that

7    there shouldn't be too much of an administrative headache for

8    these cases to proceed on through joint administration.

9           Your Honor, the debtors -- the Subchapter V debtors,

10   and just by virtue of their affiliation, the other debtors did

11   file a status conference -- a pre-hearing status report in

12   compliance with the Subchapter V form, although this, you know,

13   it's, again, adapted for 4 West and Hull Properties. All four

14   of these entities -- or each of these four entities, have

15   separate and distinct real estate holdings.

16          Hull Organization is the largest of the four

17   entities, insofar as has probably the most valuable pieces of

18   real estate, and has the most, just in number of real property

19   holdings as well.

20          Hull Equity has an area of New Albany, Indiana, has

21   several parcels along Grant Line Road that consist of an

22   AutoZone and a strip -- an out-parceled AutoZone and a

23   commercial -- a small commercial shopping strip. Excuse me.

24          Hull Properties owns two commercial condominium units

25   in the J-Town area, and 4 West owns a small high-rise in

Case 23-32983-mbn   Doc 813-1   Filed 03/16/26   Entered 03/16/26 12:12:30   Page 130
of 147
Case 23-32983-mbn   Doc 724   Filed 10/09/25   Entered 10/09/25 22:27:25   Page 6 of
22

6

1   Springfield, Ohio, although as far as Springfield, Ohio goes, a

2   small high-rise is still a high-rise.

3           These companies, most of their assets have

4   sufficient -- well, significant amounts of equity, just

5   composed of the -- just on a comparative value of the real

6   estate and the mortgage pledged against it.  Now, these debtors

7   do have other credit obligations to the Small Business

8   Administration for EIDL loans, to other mortgage lenders who

9   have cross-collateralized some -- well, not the traditional

10  banks, but the debtor has loans with Martin Goldsmith and PMGT.

11  Well, a couple of the debtors do, rather.  Hull Properties has

12  mortgages to First Financial Bank.

13          And all in, we expect that there's going to be money

14  available for unsecured creditors.  And while we're -- as I

15  say, unsecured creditors, but these are technically secured

16  creditors that have an interest, have UCC financing statements

17  filed against the debtor's assets, but are unsecured with

18  respect to the dirt and the improvements thereon.  Excuse me.

19          This case -- these cases were filed in December

20  following the appointment of a receiver in the family court

21  action.  There's a marital dissolution between Ms. Russell's

22  client, Nancy Pruitt Hull, and the principal of the debtor,

23  Robert E. Hull.  I believe that's referenced in the status

24  report.  And Ms. Russell has, of course, filed additional

25  pleadings here recently to give the Court additional background

1   on the ongoing disputes between Mr. and Mrs. Hull.

2           The receivers were appointed -- rightfully or

3   wrongfully, the receiver was appointed in family court, and

4   that created a separation between these companies and their

5   ability to manage their assets and pay their liabilities as

6   they exist.  That precipitated the filing when the receiver was

7   imbued with powers to include entering the sale -- entering the

8   properties, managing the properties, collecting rents, and

9   preparing the properties for sale in a manner that, as far as

10  the family court was concerned, was in a manner to protect

11  Ms. Hull and -- at the request of Ms. Hull.  But it was without

12  regard to the creditors of these debtors in possession.

13          And that's primarily the impetus for the filing would

14  be to make sure that secured and unsecured creditors of these

15  companies are not deprived of collection by virtue of the

16  family court deciding that Ms. Hull has a marital or equitable

17  or some nebulous interest in their real estate holdings.  I'm

18  sure the Court will hear more about that.  This is their --

19  this --

20          THE COURT:  But the real estate is all held in the

21  name of these various entities that are debtors, correct?

22          MR. YEAGER:  Absolutely correct, Your Honor.  These

23  four debtors that filed bankruptcy are the title -- record

24  title owners of all of their properties.

25          THE COURT:  And the Court hasn't got to look at your

Case 23-32983-mbn    Doc 813-1    Filed 03/16/26    Entered 03/16/26 12:12:30    Page 132
of 147
Case 23-32983-mbn    Doc 724    Filed 10/09/25    Entered 10/09/25 22:27:25    Page 8 of
22

8

1  expedited motion to sell.  It's not set for today.  But what

2  tracks are contained within that motion to sell?

3          MR. YEAGER:  So the motion to sell is as regarding a

4  property that's described as 830 and 834 Ohio Pike.  That's the

5  east side of Cincinnati.  It's, I think, State Route 125.  I

6  always called it Beechmont Avenue.  There's some malls and

7  other commercial property out there.  But the property that's

8  being sold actually consists of three parcels, as recorded with

9  Clermont County.  It's a -- it's two parcels consist of the --

10  a shopping center -- traditional shopping center.  And then

11  there's an outlot that houses a relatively newly built Domino's

12  Pizza franchise.

13          So those are the three parcels that are subject of

14  the motion.  That is what I think Mr. Hull would probably

15  characterize as the crown jewel of Hull Organization, in that

16  it's the property that has -- it has its issues, but it does

17  have paying tenants, stable tenant base, and is at least, I

18  think, 70 percent or 80 percent occupied.

19          THE COURT:  These -- the Court gets concerned when we

20  start getting hit with expedited motions to sell.  We want to

21  make sure that all the I's are dotted and the T's are crossed,

22  so to speak, in terms of -- I assume there's been updated title

23  searches done on these properties?

24          MR. YEAGER:  Yes, Your Honor.  The receiver was

25  appointed.  The -- I believe the order appointing the receiver

1    and actually giving him authority to act as receiver was

2    entered November 22nd of this year.  And there was a title exam

3    done either within the week -- I believe the -- Mr. Saba can

4    correct me if I'm wrong, but I believe the title exam that the

5    receiver relied on was from, like, I want to say,

6    November 28th.

7            THE COURT:  All right.

8            MR. YEAGER:  So this sale, although the debtor didn't

9    participate in the negotiation of the sale, we are trying to

10   carry forward what Ms. Hull and -- well, what Ms. Hull was

11   advocating for in state court.  The receiver signed the

12   contract that's been -- that is now presented for the sale --

13   for the motion to sell in bankruptcy court.  The receiver

14   listed the property with Mr. Durnil's company.  They negotiated

15   this sale contract that's been presented.  The debtor --

16   because this -- because the sale proposal and negotiation

17   occurred while the receiver was appointed, the debtor's

18   principle was, I think, appropriately concerned with the

19   decision to move ahead on the sale.

20           We've come to that -- come to terms with that and

21   presented it to this Court for approval.  But the sale has been

22   negotiated among the buyer and the receiver.  And Stock Yards

23   Bank was, I believe, heavily involved prior to the bankruptcy

24   petition filing as well to make sure that the sale was

25   appropriate under their terms insofar as that it does allow for

1  payment of -- or it will be at a sufficient price to pay Stock

2  Yards' claim in full as secured against this property.

3          THE COURT:  All right.

4          MR. YEAGER:  Stock Yards will remain a creditor of

5  Hull Equity.  But this does pay Hull Organization's liability

6  to Stock Yards, satisfies a certificate of judgment that is on

7  record in Clermont County, and there's an amount sufficient to

8  pay the 6 percent commission to Mr. Carnil.  As far as the

9  other tax liens and prorations, all that's going to be

10  accounted for.  There will be net proceeds available to the

11  bankruptcy estate.

12          THE COURT:  How much do you estimate the net proceeds

13  of the bankruptcy estate to be?

14          MR. YEAGER:  I believe -- I haven't done all of the

15  calculations.  I don't have a full amount of what --

16          THE COURT:  Ballpark figure.

17          MR. YEAGER:  I think it's between 2- and $300,000.

18          THE COURT:  Okay.  Thank you.  But let me hear from

19  the Subchapter V trustee.

20          MR. WHEATLEY:  Your Honor, as it pertains to this

21  motion to sell, from my information, the parties are in

22  agreement to the sale price.  There doesn't appear to be a

23  dispute over that.  There is going to be a dispute over the net

24  proceeds.  So to alleviate that dispute, I'm willing to take

25  the net proceeds into my escrow account and keep it there,

1  pending a further order of this Court.

2          THE COURT: All right. All right. Stock Yards Bank

3  is represented here today, and I know there has been a pleading

4  filed by Stock Yards Bank, and you -- the position of the bank

5  is they support the sale, correct?

6          MR. SABA: Absolutely, Your Honor. Yes, we do. And

7  I can just provide some insight in terms of the history. I

8  know the initial --

9          THE COURT: Why don't you come forward to the

10  microphone, counsel?

11          MR. SABA: I can certainly let you know the history,

12  Your Honor, in terms of the price, which I know is not in

13  dispute. The initial offers were somewhere in the area of

14  about $1.6 million, and ultimately then through negotiations

15  with the broker, they got them up to $1.8 million, $25,000,

16  which I believe everyone is in agreement is a fair value for

17  this property as well, and I don't think there is a dispute

18  over the actual valuation, or my understanding is at least

19  paying Stock Yards, and then get them paid off so we can get

20  the sale done.

21          So -- and I know this buyer is a cash buyer who's

22  ready to go, who's prepared to buy, would like to close if

23  possible in January if he could, particularly given the

24  uncertainty with the tenants who are wondering who they're

25  supposed to pay, when they're supposed to pay, and whether or

```
 1   not they're paying the debtor in possession, they're still
 2   paying the receiver, and it just causes confusion.  So -- and I
 3   do certainly respect the fact that the expedited sale motion is
 4   not before you today, but if there's any way they could close
 5   in January, that would be greatly appreciated.
 6           THE COURT:  The contract that has been entered with
 7   the purchaser, I assume, is -- has a provision it's subject to
 8   Court approval?
 9           MR. SABA:  I believe it does, Your Honor.
10           THE COURT:  Mr. Durnil's nodding yes.
11           MR. DURNIL:  Yes, sir.
12           THE COURT:  And does it have a deadline in it for the
13   date to close?
14           MR. DURNIL:  No, sir.  It is dependent upon the Court
15   approval and would close then 15 days upon the --
16           THE COURT:  Okay.
17           MR. DURNILL:  -- final appeals period to get the good
18   title.
19           THE COURT:  Okay.  All right.  Thank you.
20           All right.  Ms. Russell, I'll hear from you.
21           MS. RUSSELL:  Yes, Your Honor.
22           THE COURT:  Keeping in mind what's on the docket for
23   today, but I've allowed a little leeway for everybody else --
24           MS. RUSSELL:  A little bit of a leeway.
25           THE COURT:  -- to go beyond what's on the docket
```

13

1   today, so --

2           MS. RUSSELL:  Okay, Your Honor.  Well, as Mr. Yeager

3   stated, we had a receiver in the family court case.  I hope the

4   Court has had an opportunity to read these -- our motion to

5   dismiss and our limited objection.  But the essential problem

6   is an absolute failure to recognize that Mrs. Hull has a

7   marital interest in this property.

8           Judge Webb stated that over and over and over again.

9   A judge has the right to break an LLC on a long-term marriage

10  and divide the marital assets.  Mr. Hull has never disputed

11  that.  We have cited over and over, even though they say that

12  today, that he gets all the proceeds.  That even in his pre-

13  hearing statement on appeal, he recognizes these as marital

14  assets.  He begs the divorce -- his attorney on the record

15  says, Judge, we just want to sell it by a realtor.  We

16  recognize that she has a marital interest and at least one

17  half.  It may be more now due to conduct, but we won't go into

18  that today.  But that is our problem here.

19          We assisted in hiring Mr. Durnil.  We want Mr. Durnil

20  to be paid.  We agree with the contract.  It is the same

21  contract that we submitted in family court.  We wanted it to go

22  through that day.  It was on for hearing on that motion.  And

23  it was on also for contempt of court because Mr. Hull owes over

24  $200,000 in child support and maintenance and an attorney fee

25  to my firm of approximately $140,000.  So instead of agreeing

1    to that contract that day, he rushed over here and has now

2    filed no petition, no schedule, no court rules, which I'm sure

3    Mr. Stonitsch will address.

4          But we do not object to the sale going forward.  What

5    we object to is who has the rights to the proceeds.

6          THE COURT:  Well, why doesn't it work for the sale to

7    go forward, and the proceeds be paid over to Mr. Wheatley as

8    the --

9          MS. RUSSELL:  We would be delighted.

10          THE COURT:  Okay.

11          MS. RUSSELL:  And have that heard for a later date.

12    We want Stock Yards Bank to be paid.

13          THE COURT:  Okay.

14          MS. RUSSELL:  But we have problems in what Mr. Hull,

15    from his past conduct, would do with this money if it reaches

16    the debtor in possession's hands.  That's part of our problem.

17          Also, statements made at the 341 meeting by

18    Mr. Yeager yesterday that he believes SBA should get part of

19    this money.  Every lien that we've ever been able to see with

20    SBA -- this loan was acquired, number one, in violation of a

21    status quo order of the family court.  Judge Webb has said that

22    Rob Hull is responsible for all marital debt.  So when you

23    violate a court order, we do not see why our client should be

24    affected by that adversely.  So that's part of the dispute,

25    Your Honor.  And SBA does not have a lien on the real estate.

```
1    They have a lien at best --

2              THE COURT:  The SBA doesn't --

3              MS. RUSSELL:  -- on the --

4              THE COURT:  The SBA does not have a lien on the

5    properties that are subject to the motion to sell.

6              MS. RUSSELL:  Exactly.

7              THE COURT:  Okay.

8              MS. RUSSELL:  And we have no problem with any valid

9    lien, property taxes, any of those things being paid by

10   agreement with us.

11             THE COURT:  Okay.  All right.  Mr. Stonitsch, does

12   the U.S. Trustee have a position in all these matters?

13             MR. STONITSCH:  We most certainly do, Your Honor.  I

14   think the sales and everything that's been said in court this

15   morning is well and good.  It's all collateral.  It's all

16   collateral to the case.  And we haven't even talked about

17   status of the case, because it is in very dire shape.

18             This case was filed the 13th of December.  At this

19   juncture, we've had two requests for extensions in schedules.

20   We were not able to hold a meaningful 341 meeting yesterday

21   because no schedules.  There's virtually been no compliance by

22   the debtor in this case.  Again, the schedules have not been

23   filed.  We've had no initial debtor interview for the same

24   reason.  The debtor has not complied with any of our requests.

25   The small business debtor documents have not been filed in the
```

1    Hull Organization case or the Hull Equity case.

2            There's been failure to comply with the duties of the

3    DIP.  There's been no tax returns filed.  There's been no

4    financial statements.  There's been no DIP account.  There's

5    been no closure of prepetition accounts.  There's been no cash

6    ledgers filed.

7            There's been no insurance on the 4 West property that

8    we can tell.  There is some insurance on other properties, but

9    we're not sure it's adequate because the schedules haven't been

10    filed, and we don't have any idea what the value --

11            THE COURT:  Right.

12            MR. STONITSCH:  -- of these properties are.  So they

13    could be very well underinsured.  And the insurance that we

14    have received doesn't have us on as a party for notice

15    purposes, so we don't know if it's going to lapse or whatever.

16    So we don't know if there's adequate insurance.

17            Again, no IDI has been scheduled, and no turnover of

18    documents.

19            THE COURT:  All right.  That's fine, Mr. Stonitsch.

20            MR. STONITSCH:  Well, it -- the list goes on, Your

21    Honor.

22            THE COURT:  Okay.  I'm saying --

23            MR. STONITSCH:  My point is, all this is well and

24    good with the sale and everything.  All this could be done

25    outside of bankruptcy.  They filed this case, and they haven't

1   complied with anything.  It appears to me it's in bad faith to

2   the filing of a bankruptcy case in order to relieve themselves

3   of issues that they have in state court.

4           THE COURT:  Mr. Yeager, the Court has a problem with

5   a debtor who's not complying with the request from the U.S.

6   Trustee Office.  And we all know when we come into Chapter 11,

7   you're afforded all the protections that Chapter 11 affords the

8   debtors, but yet you're not complying with the requirements of

9   the U.S. Trustee, which is fundamental.

10          MR. YEAGER:  I understand that it's --

11          THE COURT:  And the most fundamental being filing of

12  the schedules.

13          MR. YEAGER:  Right.

14          THE COURT:  How can the Court rule on anything

15  without at least seeing the schedules of a Chapter 11 debtor?

16          MR. YEAGER:  Your Honor, I'm certainly sensitive to

17  the Court's approach on these things, and I think it would be

18  appropriate to make exception on this particular matter, this

19  particular sale, insofar as we are only selling a single piece

20  of property.  We're not talking about assets that haven't been

21  disclosed or any kind of rushing into any sort of going concern

22  sale for all of the assets of this estate.

23          We're trying to preserve a sale that the parties and

24  interests that are here to -- are, you know, drawing their

25  knives on us.  And Stock Yards Bank and Ms. Hull, we're doing

1    what they purportedly want.  So that --

2         THE COURT:  But --

3         MR. YEAGER:  -- **seems** to take -- that should take

4    priority from the debtor's perspective, to make sure that we --

5    that the dust can clear, and we can move forward with schedules

6    and compliance and other activities.

7         I certainly am familiar with what needs to be

8    returned or submitted to the United States Trustee's Office.

9    My client is aware of that.  We have provided bank statements

10   to the United States Trustee's Office, bank statements through

11   November.  We don't know about the activities that the receiver

12   took on after the filing.  We still need accounting from the

13   receiver on that perspective.  So --

14        THE COURT:  Well, I'm just -- I'm going to grant the

15   motion for an expedited hearing on the sale.  I'm not sure when

16   that hearing is going to be, though, but I can tell you the

17   Court's not going to approve any sale until there's substantial

18   compliance with the requirements of the U.S. Trustee's Office.

19   You're just not going to be able to cherry pick what you do in

20   the case.

21        MR. YEAGER:  I understand completely, and Your Honor,

22   the schedules are due on Friday.  That's when they'll be filed.

23        THE COURT:  All right.

24        MR. YEAGER:  If I can address the -- at least the

25   portions of the presentation that suggest that money should be

1    turned over to Mr. Wheatley as a Subchapter V trustee, I think

2    that would only be acceptable in limited circumstances where we

3    are able to have the Court ultimately approve use of cash

4    collateral that parties do have legitimate interest in

5    following the closing.  The debtors will be seeking separate

6    cash collateral authority with respect to the other rents as

7    they come.

8             THE COURT:  That may be, but I'm telling you, if the

9    Court approves this sale whenever we hear it, the net proceeds

10   from the sale are going to be paid to the Subchapter V trustee.

11   Now, where it goes from there, we can talk about, but that's

12   going to be a requirement underlying that.

13            So if I'm understanding what everybody's saying,

14   aside from the U.S. Trustee, the terms of the sale of this

15   property that Stock Yards Bank has a first lien on, essentially

16   everybody's in agreement with the underlying terms, correct?

17            MR. YEAGER:  Yes.

18            MS. RUSSELL:  Yes.

19            MR. STONITSCH:  Yes.

20            THE COURT:  All right.  I'm going to reduce the

21   objection period to ten days.  And I'm going to notice that

22   expedited motion to sale for objections within ten days.

23            But I can tell you that if the schedules are not

24   filed and there's not substantial compliance with the U.S.

25   Trustee's requirements, then that'll be up to the Court to

```
 1   determine if there's still an issue of what substantial
 2   compliance is, the Court will consider that at that time.
 3           I mean, I know there's a number of other issues
 4   floating around here.  There's a motion to dismiss and so
 5   forth.  But I don't see any good reason for the sale of this
 6   property not to go through with the parameters I've described
 7   here where the net proceeds end up in Mr. Wheatley's hands.
 8           The Court will -- I got locked out.
 9           MR. YEAGER:  Your Honor, my --
10           THE COURT:  Hang on just a second.  My -- I've gotten
11   locked out.  Thank you.
12           All right, Mr. Yeager.
13           MR. YEAGER:  Your Honor, just I guess as a preview as
14   we work through potentially some of the issues, the proposed
15   sale order at Paragraph 28 provides a roadmap for how the
16   proceeds would be used.  And Paragraph -- Subparagraph (h)
17   refers to the proceeds insofar as the broker's commissions are
18   coming out of the proceeds.
19           THE COURT:  What document number is that?
20           MR. YEAGER:  I'm sorry, it's 24-4.
21           THE COURT:  Okay.
22           MS. RUSSELL:  Your Honor, we do not object to
23   Mr. Durnil being paid.  He's earned his money.  We would
24   request an opportunity to see and approve the closing statement
25   before a closing.  And I -- we have worked with Mr. Saba, and I
```

1   believe that would be -- we could work together on that and

2   agree as to who is to be paid, what's legitimate, and what we

3   would complain about.

4          THE COURT:  Well, we're going to set the motion to

5   approve the sale.  We're going to set it down for a ten-day

6   objection period.  If there are any objections filed, then we

7   will probably set a telephonic hearing to hear those.

8          All the other pending matters will be set in this

9   courtroom on Thursday, February 8th at 10 a.m.  That will be

10  for purposes of hearing the motions, but there will not be

11  proof taken that day.

12         You might keep your calendars open.  If we do have to

13  have a hearing in the courtroom on the motion to sell, that

14  would probably be heard on January 31st if there are objections

15  filed.

16         All right.  Anything else to come before the Court in

17  the Hull Organization, LLC, or related cases?

18         MR. YEAGER:  Not at this time, Your Honor.  Your

19  Honor, is the -- the February 8th, did you say that's at

20  10 a.m.?

21         THE COURT:  Yes.

22         MR. YEAGER:  Okay.

23         THE COURT:  And if there needs to be a hearing before

24  then on an expedited basis, it would be on January 31st.

25         All right.  This concludes this matter.

```
 1              MR. YEAGER:  Thank you, Your Honor.

 2              MS. RUSSELL:  Thank you, Your Honor.

 3              (Proceedings concluded at 1:50 p.m.)

 4                         *  *  *  *  *

 5                                                .

 6

 7

 8

 9

10

11

12

13

14

15              C E R T I F I C A T I O N

16

17         I, Heidi Jolliff, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23  _____

24  HEIDI JOLLIFF, AAERT NO. 2850      DATE: October 9, 2025

25  ACCESS TRANSCRIPTS, LLC
```

**VERIFICATION**

STATE OF OHIO )
                                          ) ss:
COUNTY OF _____ )

I, David Tester, President of US Martial Arts Academy, Inc., being first duly sworn, depose and state that I have read the foregoing Complaint, that the facts set forth therein are true as I verify believe, and that this verification is made on behalf of US Martial Arts Academy, Inc., the Plaintiff in this action.

_____
David Tester, President

US Martial Arts Academy, Inc.

Sworn to before me and subscribed in my presence this 26 day of
February , 20 26 .

Brittany Marie Marcum
Notary Public, State of Ohio
My Commission Expires:
July 18th 2028

_____
Notary Public

My Commission Expires: July 28th 2028